PALMER BRICK COMPANY *v.* WOODWARD, trustee, *et al.;*
and *vice versa.*

1. A contract is not unilateral and unenforceable which contains mutual obligations equally binding on both parties to the contract.

2. A contract which grants to one of the parties thereto the use and occu·pation of premises for a definite term, with the right to take brick clay from certain land of the other party and manufacture the same into merchantable brick, for a valuable consideration moving from the other party thereto, during a specified term of years, is a contract of lease.

3. Where in such a contract it is provided that the lessee, "the said brick company, [is] to ·have the exclusive right to take from said land, or any portion thereof, and use, in the manufacture of brick, such amount of dirt and clay as they may see proper, for the said period of twenty years," and the said brick company shall pay "a royalty of twelve and one half cents per thousand, for all merchantable brick manufac-tured out of the clay taken from said land herein leased, payments to be made as follows: two hundred and fifty dollars cash, and one hundred dollars on the first day of each month during the continuance of this lease; but on the first day of January in each year an accounting shall be had between the said parties, when the said . . trustee, as afore-said, shall account for any overpayment made, and the . . brick company shall account for any deficit on the said basis of twelve and one half cents per thousand for said brick, as aforesaid,—*Held:*

(*a*) The lessee is to have the exclusive right to take from the land, or any portion thereof, and use, in the manufacture of brick, all clay that it chooses to take therefrom, and to pay ultimately for the clay so used at the rate of 12½ cents per thousand of merchantable brick manufactured therefrom.

(*b*) The payment of the $100 per month is to continue regularly as a minimum alternative sum, subject to be reduced if, at the end of each year, the company shows on an accounting that after using reasonable diligence in operating the clay mine and brick plant under ordinary conditions, there was not sufficient clay mined to make the sum of $1,200 at 12½ cents per 1,000 merchantable brick, and in that event the lessee could require the lessor to refund the overpayment.

(*c*) If the lessee, after operating the mine and brick plant as stated in note (*b*), took clay from the mine in quantities sufficient to make a sum in excess of $1,200 during the year previous to first day of January in each year, pending the lease, as. to which the accounting was to be had, the lessor had the right to demand and receive from the lessee the amount of such excess on the basis of 12½ cents per 1,000 merchant-able brick manufactured out of the clay so taken.

(*d*) By necessary implication, the lessee is bound to exercise reasonable diligence in taking clay from the mine and operating the brick plant, or else is liable to the lessor in the minimum alternative sum of $100 fixed in the contract.

(*e*) If the lessee failed to exercise reasonable diligence in mining the clay and operating its brick plant in the manufacture therefrom of merchant-

19

able brick, or declined altogether to mine the clay and operate its plant in the manufacture of brick, the lessee would lose its right of having an accounting on the first day of January of each year, and would be liable, absolutely and unconditionally, to the lessor for the $100 per month agreed to be paid, and the latter could recover of the former such payments, or deferred payments, with interest.

4. There being ample evidence to support the findings of the auditor on the questions of fact; and his findings of law being in accord with the rulings herein made, the judgment of the court overruling the exceptions of law and fact to the auditor's report was not erroneous.

JUNE 13, 1912.

Exceptions to auditor's report. Before Judge Bell. Fulton superior court. March 23, 1911.

The petition of the plaintiffs against the Palmer Brick Company showed substantially the following facts: In 1876 C. Howell, father of Catherine S. Woodward, conveyed to A. P. Woodward, the husband of Catherine S. Woodward, as trustee for his wife and children, 300 acres of land, more or less, in Fulton county, situated on and near the Chattahoochee river, a large portion of which was bottom land valuable for farming purposes, and also containing large deposits of clay suitable for making brick. In 1896, negotiations were entered into between A. P. Woodward, trustee, and the Collins Brick Company, resulting in a lease of the said lands by said trustee to said brick company for a term of 20 years, for the purpose of establishing thereon a brick manufacturing plant and using the clay for the manufacture of brick. Before the lease was executed, a petition was filed by counsel for the brick company (who was paid by the trustee) in the superior court of Fulton county, praying an order of the court authorizing the trustee to make the lease. Service was perfected on the beneficiaries, and a guardian ad litem was appointed for the minors. The order of the court authorizing the lease was granted on the 17th day of September, 1896. In accordance with the authority granted by the order, the contract of lease (prepared by the same counsel) was duly executed on the 25th day of September, 1896, the material portions of which are as follows: "This memorandum of agreement, made and entered into this 25th day of September, 1896, between A. P. Woodward, as trustee for his wife, Catherine S. Woodward, and her children, of the one part, and Collins Brick Company, a corporation of said county, of the second part, witnesseth as follows: The said A. P. Woodward, trustee as afore-

said, by this instrument hereby leases to the said Collins Brick Company, for the term of twenty years from this date, the certain tracts of land herein described, to wit: [Here follows detailed description of tracts of land amounting to 200 acres, more or less]. The said Collins Brick Company to have the exclusive right to take from said land, or any portion thereof, and use, in the manufacture of brick, such amount of dirt and clay as they may see proper, for the said period of twenty years. The said Collins Brick Company also to have the use of such part or parts of said land as may be necessary for the purpose of establishing a brick-yard thereon, and building such sheds or houses, tramways and roads, and digging such wells, ditches, and waterways, as may be necessary for the carrying on of said business of making brick, in such quantities as to them may seem proper, and for the carrying of such live stock and implements, and providing quarters for employees, as may be necessary in the conduct of said business. The said Collins Brick Company shall have the further right, by themselves or through the agency of others, to build, equip, and operate, for the carrying on of said brick manufacturing business, a railroad, of such gauge as may to them seem proper, from such point on the line of the Western & Atlantic Railroad as may be most accessible and convenient, to and across the property herein leased, or such portion of the same as may be desirable or needful, with full right of way for the same, and the privilege of changing the location of the tracks, and having such side-tracks and terminals as the exigencies of the work may seem to demand. And the said A. P. Woodward, trustee as aforesaid, further covenants and agrees, without further change [charge?] than the consideration hereinafter expressed, to procure for the said Collins Brick Company, from Nathan Lyons, trustee, etc., a right of way across his property, lying between the property herein leased and the right of way of the Western & Atlantic Railroad, for the building, equipping, and operating of the railroad hereinabove provided for, procuring from him the same right, as to the point of beginning, etc., as is provided hereinabove on his own land. It is further agreed and understood, that, for the rights and privileges above granted, the said Collins Brick Company shall pay to the said A. P. Woodward, trustee as aforesaid, a royalty of twelve and one half cents per thousand, for all merchantable brick manufactured out of the clay

taken from said land herein leased, payments to be made as follows, to wit: two hundred and fifty dollars cash, and one hundred dollars on the first day of each month during the continuance of this lease; but on the first day of January in each year an accounting shall be had between the said parties, when the said A. P. Woodward, trustee as aforesaid, shall account for any overpayment made, and the said Collins Brick Company shall account for any deficit on the said basis of twelve and one half cents per thousand for said brick, as aforesaid. It is further understood, that the said Collins Brick Company may take said clay from any one or more parts of said land at the same or different times, and may have and use the right of way for such wagon roads and other ways as may be necessary for the conduct of said business. This lease is not to restrict the right of the said A. P. Woodward, trustee as aforesaid, to the use of the farming lands of said property, but the right of the said Collins Brick Company to ingress and egress is not to be interfered with by the cultivation thereof."

The brick company took possession of the leased land and began to mine and remove the clay and to manufacture it into brick. In 1898, the name of the brick company was changed to Palmer Brick Company, and in July, 1899, W. D. Palmer sold his stock in the Palmer Brick Company and ceased to be an officer or stockholder therein. On July 5, 1899, the Palmer Brick Company made a contract with one Lyons, whereby it leased from him certain land adjoining the Woodward land, for the purpose of mining clay therefrom. The clay taken from the Lyons land was moved to the railroad over the Woodward land   Until the lease of the Lyons land, the monthly payment of the $100 was regular, but subsequently became irregular, and the quantity of clay mined on the Woodward land became less, until the brick company ceased to mine clay and manufacture brick from the Woodward land, or to pay rent therefor, but continued to occupy the Woodward land for the purposes stated in the lease contract, other than mining the clay and manufacturing the same into brick, and, while retaining possession of the land, paid no rent after 1904, nor until the filing of this suit on July 24, 1909. Prior to 1900 rent was paid as it became due, but from that time until 1904 the payments were irregular and not in full.

The case was referred to an auditor, C. L. Pettigrew, Esq., who,

after hearing the case, made his findings both on questions of law and fact, which were (generally) in favor of the plaintiffs. To the auditor's report the defendant filed exceptions to findings of law and fact, on various grounds, which were overruled by the court, and the report was confirmed and approved and a decree entered in favor of the plaintiffs for the amount the auditor found to be due by the defendant to the plaintiffs. To this judgment and decree the defendant excepted; and the plaintiffs took a cross-bill of exceptions to certain rulings.

*Mark Bolding* and *Madison Bell,* for Palmer Brick Company.

*Dorsey, Brewster, Howell & Heyman* and *H. C. Erwin,* contra.

HILL, J. (After stating the foregoing facts.)  1. The vital issue in this case is the proper construction to be given to the contract which is the foundation of the present suit, and which is set out in the facts above recited.  1. Is it a unilateral contract, as contended, and not enforceable?  2. If it is not unilateral, but mutual, does it create a lease?  3. If it creates a lease, what is the meaning of it, and what are the rights of the parties thereunder?  The auditor to whom the case was referred in the court below made a remarkably clear report, finding for the plaintiffs on questions of law and fact, to which the defendant filed exceptions. Some of these exceptions are substantially as follows:  that this contract, while called a lease, was in reality a sale of clay, or a license to mine the clay upon the best terms obtainable, without any fixed rental by the month or year; that there was no right of user in anything granted, and no contract to pay rent; that the sale of the clay was the real consideration of the contract, and all else was merely incidental to it; that the clay that was sold was the clay actually mined, and what was not mined was not sold, but remained the property of the estate; that no certain amount was to be mined, but what was mined was sold at the rate of 12½ cents per 1,000 brick manufactured therefrom, or $1.00 per car of clay suitable for making brick.  It is also insisted, that the contract is unilateral and unenforceable; that no definite amount of clay was sold; that, in order to sustain the contract, the plaintiffs must have agreed to sell and the defendant to take a certain and definite amount of clay.  All of these contentions were argued by counsel for the plaintiff in error with much ingenuity and skill; but after giving the case, and all the questions involved, much consideration

and research, we can not bring ourselves to agree with the conclusions reached by the able counsel for the plaintiff in error. In construing a contract, the intention of the parties will be ascertained if sufficient words be used to arrive at the intention; and if the intention be clear and contravenes no rule of law, it will be enforced. Civil Code, § 4266; *Fletcher* v. *Young, 69 Ga. 592; Maxwell* v. *Hoppie, 70 Ga.* 160 (2). That construction should be given to a contract which will uphold and make it valid and legal, rather than a construction which will make it otherwise. Civil Code, § 4268. Unless there are mutual promises in the contract which will bind both parties, it may be conceded that the mere promise of one of the parties to do or not to do a particular thing, without binding both, would make the contract unilateral and unenforceable. *Harrison* v. *Wilson Lumber Co.,* 119 *Ga.* 6 (3), 9 (45 S. E. 730), and cases cited; 1 Page on Contracts, § 17; *Swindell* v. *First Nat. Bank,* 121 *Ga.* 714 (49 S. E. 673); *Singer* v. *Grand Rapids Match Co.,* 117 *Ga.* 86 (43 S. E. 755). But where there is a mutuality of obligations and promises, the contract is enforceable. The issue is squarely raised in this case. There is no middle ground that can be taken in the construction of this contract. The plaintiff in error insists that there is nothing in the contract which imposes on it the obligation to take clay from the premises with which to make brick, nor to pay any sum to the defendant in error unless it does so take and use clay for the purpose of manufacturing brick. Under this contract, the plaintiff in error is bound thereby, either to take and use the clay located on the premises, as provided in the contract, or, failing in that, to pay the alternative minimum sum agreed to be paid monthly; or else it is not so bound. If it is so bound, and the lessor is also bound by his covenants, then the contract can not be unilateral, but it is a bilateral contract binding on both the plaintiffs and the defendant alike. Applying the familiar rules of construction above stated, we are clear that this contract is a mutual one, equally binding upon both parties. The contract itself, the conduct of the parties after the contract was first executed, and all the attendant circumstances leave little room for doubt that the *intention* of the parties was that both should be bound in the manner herein contended for. Both were bound in terms of the contract. The plaintiff gave up possession of his land and the right to cultivate

the portions used for mining purposes, or to mine the clay, or lease it to others for either purpose. He was getting, prior to the contract, an income of $500 annually from the land, for farming purposes, and all of these things he relinquished to the defendant for the purposes stated in the contract. He is still out of possession, and of the right to use the land for mining clay. On the other hand, the defendant is in possession, and those under whom it holds went into possession of the land containing the brick clay and built thereon houses, wells, ditches, railroad, and other improvements necessary to a well equipped brick plant. For several years it paid, and the plaintiffs received, the minimum alternative sum fixed in the contract, without protest. It is still in possession of the premises, without any offer of yielding up possession, or of paying the amount stipulated in the contract for the use of the same. We are clearly of the opinion that the contract is mutual and binds both parties thereto, and that the parties themselves so regarded it until a comparatively recent date.

2. Having held that the contract is not unilateral, but a mutual or bilateral one, we pass to the next step in this inquiry, namely, does the contract create a lease? The Civil Code, § 3690, declares: "When one grants to another an estate for years out of his own estate, reversion to himself, it is usually termed a lease. It may be confined to a particular interest in lands, such as mining or agricultural, in which event no other interest passes. If no object of the lease is stated, the mining interest will not pass unless the circumstances justify an implication of such an intention in the parties." In Jones on Landlord & Tenant, § 41, it is said: "Where the acts of digging, and so forth, are of such a character that they necessitate an actual occupation of the licenser's land, the license must be in writing to be valid, as the transaction is really a lease of the premises to that extent. Thus the right to mine certain land must be created by a lease. The case would be no different than if the piece of ground had been demised for cultivation or for any other purpose. A lease may not only confer upon the lessee the right to occupy and cultivate and to remove the products of cultivation, but it may confer on him the power to occupy and remove a portion of that which constitutes the land itself. Familiar and common examples of such leases are those authorizing the lessee to quarry and remove stone, to open mines

and remove minerals, or to sink wells for petroleum and natural gas. The power to execute leases for such purposes, and the fact that the instrument by which such interest in land is granted may be in all essential particulars a lease, will not be questioned." And in cases like the present, what constitutes a lease is stated in 27 Cyc. 690, as follows: "It is an established rule of law that whatsoever words are sufficient to explain the intent of the parties that one should divest himself of the property and the other come into it for a definite time, whether they are in the form of a license, covenant, or agreement, will, in the construction of law, amount to a lease as effectually as if the most proper and pertinent words were made use of for that purpose." See, also, note to Barnsdall v. Bradford Gas Co., 26 L. R. A. (N. S.) 614, 615 (225 Pa. 338, 74 Atl. 207). And see Bouvier's Law Dict., title "Lease." By the very terms of the contract itself the estate granted is termed a lease. It provides that "the said A. P. Woodward, trustee as aforesaid, hereby leases to the said Collins Brick Company, for the term of twenty years from this date," the lands on which is located the brick clay. The contract then defines the rights of the lessee and of the lessor, binding both to the performance of their obligations. But it is insisted that the lessee is not bound to use any clay from the leased premises, nor pay any rental when it uses no clay. The insistence is founded on two expressions in the lease contract, to wit: "The . . company to . . take from said land, or any portion thereof, and use, in the manufacture of brick, such amount of dirt and clay as they may see proper, for the said period of twenty years," and "the said . . company shall pay . . a royalty of 12½ cents per thousand, for all merchantable brick manufactured out of the clay taken from said land herein leased." The quoted language is only a part of the contract. The contract is to be construed as a whole, and not from one or two isolated excerpts from it. If it be conceded that the brick company is not bound to use any clay, nor to pay anything whether it has used any clay or not, then the contention of the plaintiff in error might be correct. But to this contention we can not agree. We think the lessee was bound to exercise reasonable diligence in using clay, and in supplying its plant with a sufficient amount of clay to meet its reasonable requirements under ordinarily favorable conditions. Such was evidently the intention of the original parties

to the contract, and they provided against just such a contingency as that insisted upon here. There was to be in any event, whether the lessee took clay or did not take clay from the mine, a payment of one hundred dollars a month, not for the term the lessee actually did take clay and manufacture the same into brick, but monthly for the full term of twenty years from the date of the lease. This view is abundantly sustained by the authorities cited to that effect later in this opinion. The parties to the contract evidently estimated that the amount of clay mined would make brick and yield an income to the lessor of at least $100 per month; that the capacity of the plant and mine would yield at least that much on a basis of 12½ cents per 1,000 brick manufactured from the clay taken from the leased premises, or $1.00 per car of clay used for making brick; and the contract provides that that amount shall be paid by the lessee to the lessor each month during the continuation of the lease, and at the end of each twelve months there shall be an accounting between the two. In the accounting, if the lessee shows that, by the exercise of reasonable diligence in the use of his brick plant and in mining the clay, it makes brick in quantities less than sufficient to yield the lessor $1,200 annually on the basis of 12½ cents on every thousand brick made, or on a basis of $1.00 for every car-load of clay used, then the lessee is to have a reduction accordingly. But if the clay used on the above basis yields more than $1,200 annually, according to the accounting, then the lessor is to have the excess above that amount, calculated on that basis. But surely it was never in the contemplation of the parties to so important a contract as this, that the lessee could use the leased premises, with houses, wells, railroad, and all the other privileges granted, and arbitrarily refuse to mine the clay for the purpose of making brick, and thus defeat the plaintiffs in their right to collect any of the rent at all. This idea is negatived by the terms of the contract itself, which provides that the $100 shall be paid each month during the continuance of the lease of twenty years. If the lessee could keep possession of the leased premises for the period of twenty years with its entire plant thereon, lease all adjoining land containing brick clay and create a monopoly of the brick business, and thus prevent the lessor from either using his own clay or getting pay for his leased premises, it would impute to the original parties to the contract an incon-

ceivable amount of stupidity. It would be unjust and unreasonable to place such a construction upon the contract. It would contra-vene the very nature and spirit of it, as manifest by the instrument itself, and by the conduct of the parties for several years after the execution of the lease. The $100 to be paid monthly was paid regularly and promptly from the beginning of the lease until the year 1904, and no question was raised, so far as the record discloses, of the construction of the contract now insisted upon. It can not be that under the contract the lessee was to be allowed to hold this property for any considerable length of time without making any effort to mine the clay, or to pay the lessor his rent. Such a construction would deprive the lessor of his rent, of the privilege of mining the clay himself, and of leasing it to others for that or any other purpose. The law does not sanction such an absurdity, or allow such an injustice to be done. When premises are leased for a certain purpose, and the amount of rent is contingent in part upon the diligence which the lessee exercises in the operation of the leased premises, the law *implies* such reasonable diligence. In 2 Snyder on Mines (1902), § 1284, it is said: "The lease of a mine, in the absence of covenants requiring a certain amount of work, at least implies that the lessee will work the same with reasonable diligence. Thus, where a right to mine coal or other minerals is granted in consideration of the reservation of a certain portion of the product to the grantor, the law implies a covenant on the part of the grantee to work the mine in a proper manner and with reasonable diligence, so that the lessor or grantor will derive the income which both parties had in contemplation when the contract was entered into." In the case of Hiller *v.* Ray, 59 Fla. 285 (52 So. 623, 20 Am. & Eng. Ann. Cases, 1162), it was held: "Where the lessors of land for the specific purpose of taking therefrom phosphate rock of a specified character and volume do not covenant that the rock actually exists in the land, and the lessees do not covenant actually to find the rock in the land, but the contract contemplates the existence of the rock and a search for it by the lessees, there is an implied obligation on the lessees to make due and reasonable effort to find the rock in the land." And in a note to the above case in 20 Ann. Cases, at p. 1172, citing a number of authorities, it is said: "Thus it has been held that where a lease provides for a definite rental per well for each gas well drilled,

and the lessee fails to perform his implied covenant to prosecute the work of drilling wells with reasonable diligence, an action at law for damages is an adequate remedy, and an action in equity for the cancellation of the lease will not lie." See also Venedocia Oil & Gas Co. *v.* Robinson, 71 Ohio, 302 (73 N. E. 222, 104 Am. St. R. 773, 2 Ann. Cas. 444).

3. From what has been said, we conclude that the contract under review created a lease of the land described therein, for mining purposes, for a term of twenty years. The lessee was to have the exclusive right to take from the land, or any portion thereof, and use, in the manufacture of brick, all clay that it chose to take therefrom, and to pay ultimately for the clay so used at the rate of 12½ cents per thousand of merchantable brick manufactured therefrom, or at the rate of $1.00 per car-load of clay so used. The brick company was to pay the lessor $250 in cash and $100 on the first day of each month during the entire continuance of the lease. The payment of the $100 per month was to continue regularly as a minimum alternative sum, subject to be reduced if, at the end of each year, the company showed on accounting that, after using reasonable diligence in operating the clay mine and brick plant under ordinary conditions, there was not sufficient clay mined at 12½ cents per 1,000 merchantable brick, or at $1.00 per carload of clay taken and used, to make the sum of $1,200, and, in that event, the lessee could require the lessor to refund the overpayment. If the lessee, the brick company, after operating the mine and brick plant as above, took clay in quantities sufficient to make a sum in excess of $1,200 during the year previous to the first day of January in each year, on which the accounting was to be had, the lessor had a right to demand and receive from the lessee the amount of such excess on the basis of 12½ cents per 1,000 of merchantable brick manufactured out of the clay so taken, or at $1.00 per car-load of clay so taken and used. We hold, further, that if the brick company failed to exercise reasonable diligence in mining the clay and operating its brick plant by the use of such clay in the manufacture of merchantable brick, or declined altogether to mine the clay and operate its brick plant therewith in the manufacture of brick, the lessee would lose its right of having an accounting on the first day of each year, and would be liable to the lessor for the $100 per month agreed to be paid, ab-

solutely and unconditionally, and the latter could recover of the former such payments, or deferred payments, with interest.

4. There being ample evidence to support the findings of the auditor on the questions of fact, and his rulings of law being in accord with this opinion, the trial judge did not err in overruling the exceptions filed to the report of the auditor.

*Judgment affirmed. Cross-bill of exceptions dismissed. Fish, C. J., and Atkinson, J., dissent. Lumpkin, J., disqualified. The other Justices concur.*

Fish, C. J., and Atkinson, J., dissenting. It will be noted, from the terms of the contract, that the brick company did not lease the land for all purposes, as the owner reserved the right to the use of the farming lands, provided such use should not interfere with the brick company's right of ingress and egress. The brick company, under the contract, procured the exclusive right to take from the land "such amount of dirt and clay as they may see proper," for a given time, to be used in the manufacture of brick, as well as the right to use such parts of the land as might be necessary for establishing a brick-yard thereon and building such houses, etc., as might be necessary for the carrying on of the business of making brick "in such quantities as to them may seem proper," the company agreeing to pay a given price per thousand "for all merchantable brick manufactured out of the clay taken from said land." The company was to pay down a given amount in cash and $100 on the first day of each month for a specified time, but, on the first day of January in each year thereafter, an accounting should be had between the parties, when the owner of the land should account for any overpayments made, and the brick company should account for any deficit, on the basis of the price stipulated as royalty. In view of these express stipulations in the contract, there was no implied obligation on the part of the brick company to use reasonable diligence in operating the clay mine and brick plant under ordinary conditions. The cardinal rule of construction of contracts is to ascertain the intention of the parties. If that intention be clear and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction. Civil Code, § 4266. Of course, the whole contract should be considered in arriving at the intention of the parties, and all parts of

the instrument should be construed with reference to each other, but no part should be discarded or ignored if such a course can be avoided; and in the absence of any fraud, accident, or mistake, the instrument, if free from ambiguity, must be taken as written,—in other words, in such a case the parties must stand or fall by the terms of the writing. In the majority opinion, as it seems to us, no force whatever is given to the terms of the contract which clearly indicate that the brick company should have the option to use such amount of dirt and clay from the land as to the company might seem proper. While it is true that the company obligated itself to pay $100 on the first day of each month, an accounting was to be had on the first day of January of each year for the purpose of ascertaining whether or not the company had paid for more or for less clay than it had used during the preceding twelve months. If it had paid for more than it had used, the owner of the land was to repay the company the overplus; and if it had paid for less than had been used, the company was to pay the deficit. Doubtless the very reason for having such an accounting was that the company had the option, under the express terms of the contract, of determining how much clay should be taken and used from the land. The quotation from 2 Snider on Mines, § 1284, used in the opinion of the majority of the court, is not, in our opinion, applicable to the contract involved in the case at bar. The gist of that quotation is: "The lease of a mine, in the absence of covenants requiring a certain amount of work, at least implies that the lessee will work the same with reasonable diligence." While it is true that the contract in the present case does not contain a covenant requiring a certain amount of work to be done in mining the clay, there are, as we have seen, express provisions to the effect that the brick company shall have the option to remove from the land such amount of clay as it shall see proper, and to pay, for the amount so removed, a given price. In support of the text from Snider on Mines, quoted in the majority opinion, are cited the following cases. Cotch's Appeal, 93 Pa. St. 434; Sharp v. Wright, 28 Beavan, 150; Barnard v. Arnold, 27 Conn. 617; Watson v. O'Hern, 6 Watts, 362. In none of the contracts construed in these cases, nor in any other case cited in the majority opinion, was there anything indicating that the person who was given the right under the contract to mine the coal or other mineral

had the option or discretion of determining the quantity of the mineral that he should take from the land. In the case in hand, as we have already indicated, the contract clearly expresses all of the obligations undertaken by the brick company, and there is no room for imposing more upon it by implication. The intention expressed in the instrument must be given its legal effect.

If, however, the majority of the court are right in deciding that, under the terms of the contract, the brick company was under an implied obligation to use reasonable diligence in operating the clay mine and brick plant under ordinary conditions during the entire lease, then we are of opinion that the measure of damages which the owner of the land would be entitled to recover of the brick company for failure to mine the clay and operate its brick plant would not be $100 per month with interest thereon. The exclusive right given to the brick company under the contract in this case to take clay from the land for the purpose of making brick does not stand upon the same footing as, say, a lease by the owner of his grist-mill to another for a given term, the rental to be paid being a given proportion of the tolls. In such a case, if the lessee should immediately shut down the mill and refuse to operate it at all during the term, the lessor at the end of the lease would merely get back his mill without receiving any rental, and would therefore have a right of action for the value of the full amount of what would have been his proportion of the tolls had the mill been operated as the parties contemplated. Where, however, a right to mine minerals is granted in consideration of the reservation of a certain portion of the product for the lessor, and the lessee wholly fails to operate the mine, the lessor, at the end of the term, would still have the minerals which the lessee had failed to mine, and therefore the lessor would not be entitled to get back all of his ore and also recover from the lessee for the portion of it which he would have received had the lessee mined it all. In such a case, as to the proportion of the mineral which the lessor would have received had it been mined as contemplated, the damages which he would be entitled to recover would be the difference between the stipulated price and its value in the mine. Lyon *v.* Miller, 24 Pa. St. 392.