A03A0176. CAMP et al. v. PEETLUK et al.
(585 SE2d 704)

SMITH, Chief Judge.

Attorneys Scott Camp and David Whitman filed suit against attorneys Ellis W. Peetluk and Robert H. Benfield, Jr. Camp and Whitman alleged that Peetluk breached their joint representation agreement. They further alleged that both Peetluk and Benfield breached an oral escrow agreement and converted the funds that

were to be set aside under that agreement. Peetluk and Benfield obtained summary judgment on all claims. Because we find that jury issues remain as to whether Peetluk breached the joint representation agreement and failed to exercise good faith in the performance of his duties under that agreement, we reverse, in part, the judgment as to Peetluk only. We affirm the portion of the trial court's order granting summary judgment to both Peetluk and Benfield on the claims for breach of the escrow agreement and conversion.

This case arises out of a multi-vehicle collision that occurred in September 1996 and that involved a tractor-trailer operated by an employee of Ingles Markets, Inc. Two children died as a result of the collision. Peetluk represented the children's father, Mr. Harper, in a civil action against Ingles.[1] The Harper case settled in mid-trial in June 1998.

Meanwhile, in October 1996, John Williams, who was injured in the same collision, retained the law firm of Camp & Camp to represent him in a personal injury action. Whitman was associated to help with the lawsuit. In October 1997, Whitman filed suit in Fulton County State Court on behalf of Williams against Ingles and the driver. The action was removed to federal court.

After the Harper case settled, Peetluk contacted Whitman and suggested that Whitman associate him in Williams's case. The parties executed a joint representation agreement drafted by Peetluk, which provides in relevant part:

> The undersigned attorneys hereby agree that all of the attorney's fees recovered in the above referenced civil action are to be divided as follows. Of the 33⅓% of the recovery by settlement or judgment 23⅓% is to be paid to Scott Camp and David Whitman and 10% of the recovery is to be paid to Ellis W. Peetluk & Associates, P.C. It is agreed that Ellis Peetluk will take over as lead trial counsel with all of the corresponding duties as such. Scott Camp and David Whitman will remain involved in the case as co-counsel.

Camp testified that he agreed to associate Peetluk because Peetluk offered to share all the discovery material from the Harper case. Whitman testified that Peetluk "was brought into the case for discov-

---

[1] The Harpers, who are divorced, initially had retained the same law firm, a firm unconnected with Peetluk. Peetluk admitted that despite knowing that Mr. Harper had executed a fee agreement with that firm, he prepared and presented three fee contracts to him, and Mr. Harper then retained him. Peetluk testified, "I matched the arrangement [the other firm] gave him." Peetluk described the Harper case as "the most lucrative [case] I've seen" and termed it "the case of a lifetime for any lawyer – any personal injury lawyer."

ery and settlement. I don't believe that Ellis [Peetluk] has ever tried a civil case."[2]

Peetluk assumed the role of lead counsel and entered an appearance in December 1998. Near the date scheduled for mediation, Peetluk allegedly told Williams that Whitman and Camp had "irreparably damaged" his case by failing to obtain continued medical treatment for him. Williams, who cannot read or write, apparently became increasingly upset and disturbed by Peetluk's statement to him and blamed Whitman and Camp for damaging his claim.

On November 10, 1999, Williams sent a letter, which was handwritten by his daughter-in-law, to Camp. In the letter, Williams complained, "It was not until Mr. Peetluk began working on my case that I went to a doctor. He has gotten me to see four Doctors." The letter closed saying, "I *do not* want you or Mr. Whitman to be my attorneys any more. You are both fired and if that means I lose Mr. Peetluk than [sic] so be it." (Emphasis in original.)

In early January 2000, Peetluk associated Benfield to help him with the case. On January 12, Williams executed a new fee agreement under which Peetluk and Benfield, the new lead counsel, would each receive 20 percent of any gross recovery. The fee contract stipulated that any funds applicable to any attorney fee dispute with Whitman and Camp "shall come from the attorney fee portion of any gross recovery, specifically from that portion allocated to the Peetluk firm."

Whitman and Camp filed a lawsuit against Peetluk in Gwinnett County in July 2000 seeking, among other things, a declaratory judgment that Peetluk had breached the joint representation agreement and damages. Peetluk and Benfield tried Williams's personal injury case in late October 2000 and obtained a verdict in favor of Williams. In late November, the parties in this case, their attorneys, and counsel for Williams met to try to resolve a lien previously filed by Whitman and Camp. Alleging that Benfield breached an escrow agreement reached at that meeting and converted the funds that were to be escrowed, Whitman and Camp added Benfield as a defendant in this action.

The trial court granted summary judgment to Peetluk and Benfield, concluding that "when Mr. Williams terminated his contract with plaintiffs, he also severed his professional relationship with defendant Peetluk. This termination of the plaintiffs as attorneys for Mr. Williams ended any joint representation agreement between plaintiffs and defendant Peetluk." The court further found that the

---

[2] Counsel for Mrs. Harper tried the earlier case until it ended in a settlement. Before the Harper case, Peetluk's sole civil trial experience was a simple battery case.

recovery of a judgment in Williams's favor "was a result of the efforts [of] defendants Peetluk and Benfield. Any claim plaintiffs may have would be against their former client, John Williams, in quantum meruit for services rendered prior to being fired." On the claim for breach of the agreement to escrow part of the funds to safeguard them during this lawsuit and the claim for conversion, the trial court also found for Peetluk and Benfield. Noting that the formation of the escrow agreement was in dispute, that there was no writing, and that no evidence showed a meeting of minds, the trial court decided "there is no enforceable agreement that defendants could breach." The trial court also found "there is no valid conversion claim against either defendant." Whitman and Camp appeal from these rulings.

1. Whitman and Camp contend that the order granting summary judgment is void because jurisdiction and venue were not proper. Apparently relying on Peetluk's pleadings in a pending divorce action in Florida, which recited that he was a resident of Florida, Whitman and Camp filed suit under the Georgia Long Arm Statute in Gwinnett County, where the joint representation contract was signed. Following an evidentiary hearing, the trial court found that Peetluk was a resident of Cobb County and entered an order transferring the case to Cobb County.

"[F]or purposes of venue and other jurisdictional questions, a person's residence at the time of filing of suit is the determining factor." *Franek v. Ray*, 239 Ga. 282, 285 (236 SE2d 629) (1977). In deciding the issue of venue, the trial court acts as factfinder. *McLendon v. Albany Warehouse Co.*, 203 Ga. App. 865, 866 (1) (418 SE2d 130) (1992). When the record contains any evidence to support the trial court's finding on venue, that determination will not be disturbed unless the evidence demands a contrary finding. Id. Here, a contrary finding is not demanded.

Conflicting evidence was presented concerning Peetluk's residence at the time the lawsuit was filed. But this court is not the factfinder and cannot determine which evidence of Peetluk's residence is more credible. Instead, it was within the exclusive province of the trial court to weigh the conflicting evidence presented at the transfer hearing and to determine whether venue in Gwinnett County was proper under the Long Arm Statute or whether venue was proper in Cobb County. Some evidence was presented that Peetluk resided in Cobb County on the day this lawsuit was filed, and we are not authorized to disturb the trial court's ruling on this issue.[3]

---

[3] The fact that the evidence concerning venue was conflicting is sufficient for us to conclude that the trial court did not abuse its discretion in reaching its decision. We are not overstating the record, however, by observing that Peetluk must have been devious either in the Florida court or in the trial court, or both. But it was for the trial court to resolve the dif-

2. Whitman and Camp contend that the trial court erred in finding that the joint representation contract terminated as a matter of law. Because the record contains a number of disputed issues, we agree.

The facts of this case are similar in many respects to those in *Roberson v. Eichholz*, 218 Ga. App. 511 (462 SE2d 382) (1995). In that case, attorney Eichholz sued attorney Roberson for breach of a joint representation agreement. Id. Their client obtained other counsel and received a settlement of $1,300,000, of which Roberson received a fee of $300,000. Id. The trial court granted partial summary judgment to Eichholz on the ground that a letter agreement between the two attorneys constituted a valid contract. Id. This court affirmed, finding that the agreement

> contain[ed] all terms and conditions necessary to form a valid and binding contract, and it is enforceable. The contract provisions did not require future negotiations or indicate that an agreement had not been reached on the essential conditions. The provisions contained the agreed-upon subject matter, consideration, terms, and the uncontroverted mutual assent by both parties to its terms. [Cits.]

Id. at 513. Applying OCGA § 13-4-23, we also found that Roberson's conduct excused Eichholz from performance. Id. That statute provides, "If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." OCGA § 13-4-23.

Although a client has an absolute right to discharge his lawyer, the enforceability of Williams's contract with Camp & Camp is not at issue. Rather, the issue is the enforceability of the joint representation agreement entered into by Whitman and Camp, on one hand, and Peetluk, on the other. For nearly 100 years, our courts have enforced such agreements between attorneys. *Bennett v. Burkhalter*, 128 Ga. 154, 155 (1) (57 SE 231) (1907). See also *Roberson*, supra. Here, as in *Roberson*, there is no dispute that the joint representation agreement contained all the terms and conditions essential to the formation of a valid and binding contract.

Peetluk claims that the agreement became a nullity because Whitman and Camp did not recover any sums for Williams before being fired. We do not agree. A number of questions exist as to whether Peetluk acted in bad faith and rendered impossible Whitman's and Camp's performance under the joint representation agree-

---

ficult issue of Peetluk's credibility and to determine which of his conflicting statements concerning his residence was more credible.

ment. See *Roberson*, supra. Every contract implies a covenant of good faith and fair dealing in the performance of the terms of the agreement. See *Stuart Enterprises Intl. v. Peykan, Inc.*, 252 Ga. App. 231, 233 (2) (555 SE2d 881) (2001). "This implied duty 'requires both parties to a contract to perform their promises and provide such cooperation as is required for the other party's performance.'" (Footnote omitted.) *Physician Specialists in Anesthesia v. MacNeill*, 246 Ga. App. 398, 407 (5) (539 SE2d 216) (2000). And, "where the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith." (Citation and punctuation omitted.) *Rogers v. Farmers & Merchants Bank*, 247 Ga. App. 631, 633 (545 SE2d 51) (2001). Finally, "[t]he question of good faith is for the jury." Id.

Here, the record contains evidence from which a jury could find that Peetluk failed to exercise good faith in carrying out the terms of the joint representation agreement, which provided for Whitman and Camp to remain involved in the case as co-counsel. Several issues arise out of Peetluk's statements and conduct with respect to Williams's medical treatment. It appears that at the time Peetluk became associated with the case, Williams had discontinued medical treatment and settled his related workers' compensation claim for $5,000.[4] After allegedly discovering that Williams was in pain, Peetluk told him that "to pursue his claim he needed to get medical treatment." Peetluk arranged for several doctors on a lien basis to treat Williams for depression and back pain. Peetluk made these arrangements, however, without Whitman's or Camp's knowledge.

Whitman testified during his deposition that had he known that Peetluk was locating new doctors to treat Williams, he would have found this decision to be inappropriate. He testified, "I don't find doctors for my clients. They find their own doctors so that when they go to the depositions the first question they hear is where'd you find that doctor, they don't hear from my lawyer. Because you've now turned that doctor into a prostitute in my opinion." He explained that his plan had been to use the treating physicians provided by workers' compensation to establish Williams's damages at trial.[5] It appears to be undisputed that Peetluk paid at least a portion of Williams's doctors' fees himself, a fact that he initially denied under oath. During his deposition, he testified that he did not routinely pay medical bills on behalf of personal injury clients and that he "didn't do it for Mr. Williams." He similarly testified that he "never paid for any of his

---

[4] Camp testified that the treating physician had released Williams from care because "he had reached his maximum level of recovery."

[5] Camp similarly testified that "I find it offensive for plaintiffs attorneys to hook up their claimants with doctors of their choosing."

doctors." But after being shown a copy of the register for his own checking account, Peetluk admitted that he had paid some of Williams's doctors.[6]

In addition to arranging for medical treatment without the knowledge and consent of his co-counsel, Peetluk did not inform Whitman and Camp of the pre-mediation meeting he had with Williams, at which he allegedly told Williams that Whitman and Camp had "irreparably damaged" his case by failing to pursue continued medical treatment. Because they were unaware of this meeting, Whitman and Camp were unable to explain their tactics to Williams before he fired them. In addition, when Williams became increasingly angry with Whitman and Camp because of the supposed damage they had caused, Williams communicated that dissatisfaction to Peetluk. But Peetluk admitted that he never informed Whitman or Camp about Williams's concerns about their representation. Questions of bad faith are ordinarily for the jury. See *Tyler v. Lincoln*, 272 Ga. 118, 122 (2) (527 SE2d 180) (2000); *Rogers*, supra at 633. Several issues are raised by the record as to whether Peetluk acted in bad faith and made performance by Whitman and Camp impossible, and summary judgment in Peetluk's favor was not authorized. See generally *Brown v. Freedman*, 222 Ga. App. 213, 216 (2) (474 SE2d 73) (1996).

Other factual issues exist as well. Contrary to the trial court's finding that Peetluk was terminated along with Whitman and Camp, the evidence concerning this issue is in dispute. Even though Williams testified that Peetluk was fired, Peetluk's actions belie that claim. See *Guillebeau v. Jenkins*, 182 Ga. App. 225, 229 (355 SE2d 453) (1987) (attorney-client relationship may be implied from conduct of parties). Unlike Whitman, Peetluk never sought permission to withdraw from representation. Although Peetluk testified that after October 28 and before January 12, "technically, I did not represent John as his attorney," Peetluk admitted that in late December when defense counsel contacted him to see if Williams would accept $250,000, "I communicated [the offer] to John. John summarily rejected it."[7] Also, the so-called discharge letter, upon which the trial court relied, does not explicitly or implicitly say that Peetluk also was fired. Instead, the letter is captioned, "Dear Mr. Camp," and states, "you are both fired. . . ." The term "both" appears to refer to Whit-

---

[6] Any issue about the applicability of Rule 1.8 of the Rules of Professional Conduct, or any other rule concerning ethical or professional conduct, is not before this court. See Comment to Rule 1.8 entitled, "Financial Assistance to Clients."

[7] Whitman testified that he and Camp did not learn of the settlement offer until after they were fired.

man and Camp, not to Peetluk. The letter merely speculates, "if this means I lose Mr. Peetluk than [sic] so be it."

In addition, contrary to the court's finding that the judgment awarded to Williams "was a result of the efforts [of] defendants Peetluk and Benfield," the record contains disputed evidence concerning this issue. Although Peetluk testified that he never spoke to Whitman and Camp "about the case from the time I signed the association agreement until [the November meeting]," Camp testified otherwise. Camp recalled that he helped Peetluk prepare discovery responses and that he and Peetluk were both present at Williams's deposition. Camp testified that he also had worked with Peetluk on document production and that "Ellis request[ed] that I assist on some of the issues."

Summary judgment is appropriate only when no genuine issues of material fact exist and when "the undisputed facts, viewed in the light most favorable to the non-movant, warrant judgment as a matter of law." (Footnote omitted.) *Assurance Co. of America v. BBB Svc. Co.*, 259 Ga. App. 54, 57 (576 SE2d 38) (2000). Because the record contains a number of disputed factual issues, we reverse the trial court's order granting summary judgment to Peetluk on Whitman's and Camp's claim seeking enforcement of the joint representation agreement and damages. Whitman and Camp argue that their motion for summary judgment should have been granted, and we are greatly troubled by Peetluk's behavior. But given the factual issues in this case and the well-settled law that issues concerning bad faith must be decided by a jury, we are constrained to conclude that the question of Peetluk's bad faith is inherently one for a jury.

3. Whitman and Camp argue that the trial court erred in granting summary judgment against them on their claims for breach of a purported escrow agreement and conversion. Apparently as a result of an oral agreement allegedly made at the late November meeting to escrow certain funds, Whitman and Camp conditionally released and then dismissed their lien. In this action, they seek enforcement of the purported escrow agreement and allege that Peetluk and Benfield converted their funds. No agreement as to all material terms relating to an escrow of funds was memorialized into a single writing. Although counsel for the appellants apparently concluded that a firm agreement had been created on November 17 to escrow the attorney fees obtained by Peetluk, the exchange of correspondence that followed the meeting shows otherwise. On November 22, while noting that some progress was made at the meeting, Benfield outlined several unresolved issues. In a subsequent letter, Benfield claimed, "there was in fact no meeting of the minds between the interested parties as to the lien on November 17, 2000."

After reviewing the record, including the parties' correspondence and the documents relating to the lien, and after considering the relevant testimony, we find that the evidence fails to show a meeting of the minds that resulted in a valid and binding escrow agreement. See *Tekin v. Whiddon*, 233 Ga. App. 645, 648 (2) (504 SE2d 722) (1998). The trial court therefore correctly refused to enforce the purported agreement. See id. "Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights." (Punctuation and footnote omitted.) *Corbin v. Regions Bank*, 258 Ga. App. 490, 495 (2) (574 SE2d 616) (2002). Since an enforceable escrow agreement was not created, the cause of action for converting escrow funds must fail.

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Miller, J., concur.*

DECIDED JULY 15, 2003 — 

*Rich & Smith, Randolph G. Rich*, for appellants.
*Kasowitz, Benson, Torres & Friedman, Michael E. Hutchins, Frank A. Ilardi, Clinton W. Sitton*, for appellees.

