A04A2174. WIRELESSMD, INC. v. HEALTHCARE.COM CORPORATION.
(610 SE2d 352)

ELLINGTON, Judge.

This case arises from Healthcare.com Corporation's ("Healthcare") purchase of computer software and other assets from WirelessMD, Inc. Consideration for the sale included Healthcare's forgiveness of almost $3 million WirelessMD owed to Healthcare, plus Healthcare's promise to pay royalties to WirelessMD based on a

percentage of the net profits from the resale of the software. When Healthcare failed to sell the software and generate any royalties, WirelessMD sued Healthcare for breach of contract and common law fraud. The trial court granted summary judgment to Healthcare on all counts, and WirelessMD appeals. We affirm for the reasons set forth below.

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law. OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). A defendant carries this burden by demonstrating the absence of evidence as to one essential element of the plaintiff's case. Id. If the defendant does so, the plaintiff "cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." (Citation omitted.) Id. Our review is de novo. *Pyle v. City of Cedartown*, 240 Ga. App. 445, 446 (524 SE2d 7) (1999).

So viewed, the evidence shows that in 2000, WirelessMD entered into two intellectual property licensing agreements with Healthcare. By June 30, 2001, however, WirelessMD was delinquent in paying almost $3 million under the licensing agreements. It is undisputed that WirelessMD was unable to pay the debt. Because Healthcare was not in a financial position to "write off" the debt as a loss, Healthcare considered forgiving the debt in exchange for computer software developed by WirelessMD.[1] Healthcare engaged a third party, Phillips Hitchner Group, Inc. ("PHG"), to appraise WirelessMD's software. PHG returned a valuation of $3,300,000. In calculating the value of the software, PHG used budget projections, including sales and marketing expenses, which had been provided by Healthcare management.

On July 13, 2001, Healthcare and WirelessMD entered into an Intellectual Property Purchase Agreement for the purchase and sale of the software and related assets. Under the terms of the Purchase Agreement, Healthcare agreed to credit $2,937,429.50 against WirelessMD's debt in exchange for the software. The agreement also provided that Healthcare would pay WirelessMD royalty fees equal to one-fourth of Healthcare's net profits from the sale of the software over a ten-year period.[2] Any losses incurred by Healthcare attributable to the software were to be set off against future royalty payments. The Purchase Agreement, however, contained no express

---

[1] The software was designed to facilitate the sharing of data between physicians, hospitals, and other healthcare entities via hand-held electronic devices, computers, and cellular phones.

[2] The Purchase Agreement provided:

provision requiring Healthcare to market the software, nor was there any required minimum royalty payment due from the sale of the software. The Purchase Agreement also included a seven-year non-competition and nonsolicitation provision forbidding WirelessMD from developing software or services competing with the software or soliciting Healthcare's customers for the purpose of selling products in competition with the software.

After the parties entered into the Purchase Agreement, Healthcare failed to sell any of the software. According to Lance B. Friedman, a former vice president of WirelessMD, the software was "fully marketable" at the time it was purchased by Healthcare. Healthcare's CEO deposed, however, that he talked to clients about the software, but could not get anyone to buy it because there was a competitive product available that was cheaper and compatible with more devices. It is undisputed that Healthcare took no other significant efforts to market the software.

In July 2002, WirelessMD sued Healthcare, claiming it had breached the Purchase Agreement by failing to undertake a good faith effort to market the software within a reasonable period of time and that Healthcare misrepresented its intent to market the software. The trial court granted summary judgment to Healthcare, and WirelessMD appeals.

1. WirelessMD contends the Purchase Agreement contained an implied obligation on the part of Healthcare to market the software. We disagree.

> [T]he introduction of an implied term into the contract of the parties can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties. Consequently, though courts are generally reluctant to make contracts for the parties, they will imply promises or duties when justice, good faith, or fairness so demand.

---

3.2 Earn-Out Portion. As the remaining consideration for the transfer and sale of the Assets, [Healthcare] shall pay [WirelessMD] royalty fees (the "Royalty Fees") each calendar quarter for a ten (10) year period commencing on the Closing Date, in an amount to be computed by multiplying (i) the net profits . . . recognized by [Healthcare] directly from the Software or from services directly related to the Software, and (ii) the number 0.25; provided that the total Royalty Fees paid to [WirelessMD] over such ten (10) year period will not exceed Five Million, Six Hundred Twenty Five Thousand Dollars ($5,625,000).

(Citations, punctuation and emphasis omitted.) *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. 148, 149 (1) (304 SE2d 365) (1983). "An implied term in an agreement exists where it is reasonable and necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they deemed it unnecessary to state."[3] (Citation omitted.) *Fisher v. Toombs County Nursing Home*, 223 Ga. App. 842, 845 (2) (479 SE2d 180) (1996). In determining whether to imply a contractual term, "each case must be examined in light of its particular facts," including the language of the contract and the circumstances of the case. *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 151 (1).

(a) In Georgia, the issue of whether a contractual obligation should be implied has been developed in a line of cases involving mining leases. These decisions involved leases which required the lessee to pay royalties to the landowner based on materials mined from the land but did not impose an express obligation on the part of the lessee to mine the land. *Davidson Mineral Properties v. Baird*, 260 Ga. 75 (390 SE2d 33) (1990); *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 148; *Palmer Brick Co. v. Woodward*, 138 Ga. 289 (75 SE 480) (1912); *Hodges v. Ga. Kaolin Co.*, 108 Ga. App. 115 (132 SE2d 86) (1963). The general rule that emerges from this line of cases is that if the lease did not provide for the landowner to receive any guaranteed compensation, but instead provided that the only consideration the landowner would receive under the contract was royalties from the mining, the lease should be construed to include an implied duty to mine within a reasonable time. *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 150 (1). "The theory is that if the parties have entered into such a lease they must have contemplated a duty to mine, since otherwise the lessor *would receive no benefits at all* from the contract, thus frustrating his or her intention in entering the agreement." (Citations omitted; emphasis supplied.) Id. Conversely, where the lease provided that the landowner receive some compensation regardless of whether the land was mined, the Court should look at the language of the contract and the other circumstances of the case to determine whether it is absolutely necessary to imply a duty to mine.[4]

---

[3] Perhaps the most well known case associated with the doctrine of implied contractual obligation is *Wood v. Duff-Gordon*, 222 N.Y. 88 (118 NE 214) (1917), in which Justice Cardozo found that Wood had an implied obligation to market Lady Duff-Gordon's indorsement and designs because "[u]nless he gave his efforts, she could never get anything." Id. at 91.

[4] Similarly, courts in other jurisdictions which have considered cases in which a defendant failed to market the plaintiff's products have found that it was unnecessary to imply a duty to market the products when the plaintiff received substantial, guaranteed compensation under the contract. See *Emerson Radio Corp. v. Orion Sales*, 253 F3d 159, 169 (II) (A) (2) (3rd Cir. 2001) (refusing to imply a duty to use reasonable efforts in "exploiting" plaintiff's trademark when the contract provided a substantial initial payment, thereby ensuring some payment if the

Id. at 151 (1) (wherein the Court found no implied duty to mine when the lease provided for monthly rental payments which would serve as consideration for the lease if the lessee did not mine the land. The Court concluded that, when the parties agreed to the guaranteed payments, they must have contemplated that mining might not occur and intended for the compensation to serve as consideration for the lease.).

In this case, the Purchase Agreement provided for substantial compensation to WirelessMD in the form of an immediate credit against WirelessMD's almost $3 million debt to Healthcare,[5] so the benefit of the Purchase Agreement to WirelessMD did not lie solely in the possibility of future royalty payments. Therefore, it is not absolutely necessary to imply a duty on the part of Healthcare to market the software in order to ensure that there is sufficient consideration for the contract. *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 149-150 (1).

(b) This does not end our analysis, however, since we must also consider whether other circumstances exist in this case that make it necessary to imply a duty for Healthcare to market the software. *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 149-150 (1). On this issue, WirelessMD relies upon *Hodges v. Ga. Kaolin Co.*, 108 Ga. App. at 118, and contends that Healthcare acknowledged its duty to market the software by undertaking preliminary sales efforts. *Hodges*, however, is distinguishable from the instant case. At issue in *Hodges* was whether a provision in a land lease created an implied duty requiring the lessee to mine the land within a reasonable time. Id. at 115 (1). The lease provision allowed the lessee to excavate the land to search for kaolin, remove timber, and pile waste dirt on the land. Id. This Court determined that, because these actions made the property unfit for any other purpose and left the lessor in a worse position than if the lessee had done nothing at all, the lessee's exercise of its rights under the contract was "dependent upon a purpose of the lessee to proceed with a mining operation." Id. at 118 (1). Therefore, the Court

---

defendant failed to act); *Paradata Computer Networks v. Telebit Corp.*, 830 FSupp. 1001, 1006 (IV) (C) (E.D. Mich. 1993) (refusing to imply a duty to use best efforts to market the licensor's products when the licensor received a substantial licensing fee and prepaid royalties which protected it from the possibility that the licensee would do nothing to market the products).

[5] WirelessMD attempts to distinguish *Higginbottom* and similar cases from the instant case on the basis that the "upfront" compensation in the other cases was referred to as "advance royalties," whereas in this case, there was forgiveness of an existing debt. But this is a distinction without a difference. The issue is not how the compensation is characterized, but whether there was adequate consideration to sustain the agreement. See *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 149-150 (1).

Moreover, although WirelessMD enumerated as error a challenge to the validity of the debt, it abandoned the error by failing to support it with argument or authority. See Court of Appeals Rule 25 (c) (2).

held that the lessee had impliedly undertaken to mine the land with reasonable diligence. Id.

In this case, however, WirelessMD has failed to show that, due to Healthcare's preliminary sales efforts, WirelessMD is in a worse position than if Healthcare had done nothing at all to market the software. Thus, WirelessMD's reliance on *Hodges* is misplaced and this claim fails.

(c) WirelessMD further argues that other circumstances of this case, including extrinsic evidence regarding facts occurring prior to the execution of the Purchase Agreement, should be considered in determining whether there was an implied contractual duty for Healthcare to market the software. *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 151 (1). Although the Supreme Court in *Higginbottom* held that the particular facts and circumstances of each case must be considered in determining whether to imply a contractual term, it is unclear whether these "particular facts and circumstances" include evidence of representations made by the parties and negotiations which occurred prior to the execution of the contract. Further, the Supreme Court did not address whether the contract in *Higginbottom* included a merger clause, as in the instant case,[6] and whether such clause would prevent the consideration of this extrinsic evidence when determining whether to imply a contractual term. See generally *Watson v. Zurich-American Ins. Co.*, 221 Ga. App. 4, 5-6 (1) (470 SE2d 684) (1996) (parol evidence of prior or contemporaneous representations is inadmissible to add to, take from, or vary a written instrument). Even so, pretermitting whether WirelessMD's extrinsic evidence should be considered in this case, we find WirelessMD has failed to demonstrate that such evidence presents an issue of material fact regarding whether the agreement included an implied duty for Healthcare to market the software.

WirelessMD points to evidence that, when Healthcare was considering purchasing the software, Healthcare created a proposed budget showing $2 million in projected development and marketing costs for the software. Healthcare provided this budget to an independent appraiser, PHG, to be used in determining the value of WirelessMD's software. According to the final appraisal document, the appraisal's "sole purpose" was for "internal tax and financial reporting relating to the allocation of [the] purchase price" of the software, and it was to be used only by Healthcare management and its advisors.

According to WirelessMD, however, Healthcare's creation of this budget amounted to an affirmative representation to WirelessMD

---

[6] See Division 3, infra.

that Healthcare "intended to invest over $2,000,000" in developing and marketing the software, and it argues Healthcare should be required to make such investment. But WirelessMD has failed to show how Healthcare's estimates of possible future expenses, intended for internal use only, could possibly rise to the level of an affirmative representation to WirelessMD that would make it necessary to imply an obligation for Healthcare to make such an investment. In fact, WirelessMD cites to no evidence in the record that it saw, let alone relied upon, the budget prior to executing the Purchase Agreement. Further, WirelessMD has failed to demonstrate how Healthcare's estimates of possible future expenses shows that Healthcare intended to be *required* to market the software under the Purchase Agreement. Accordingly, this evidence fails to show that it is absolutely necessary to imply such an obligation in the Purchase Agreement.

Moreover, other evidence of the circumstances surrounding the negotiation and execution of the Purchase Agreement actually undermines WirelessMD's position. The record shows that the Purchase Agreement was a detailed contract memorializing a significant transaction between sophisticated parties. The agreement specifically noted that both parties "negotiated this Agreement and the transactions contemplated herein in good faith and at arms length." Although there was evidence that, prior to the execution of the Purchase Agreement, Healthcare drafted a proposed term sheet for use in negotiations which included a "best efforts" provision in the contract, the final agreement included no such provision. Therefore, the failure to include an express obligation for Healthcare to market the software or, at the very least, to use its "best efforts" to market the software, makes it unlikely that such obligation was intended by the parties but mistakenly left out of the final agreement. In a situation like this,

> [t]he choice lies between implying a promise to correct an apparent injustice in the contract [or] holding the parties to the bargain which they have made. The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the parties are aided by counsel, and in such circumstances it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it.

(Citation omitted.) *Emerson Radio Corp. v. Orion Sales*, 253 F3d at 168 (II) (A) (2). See also *Paradata Computer Networks v. Telebit Corp.*, 830 FSupp. at 1005 (IV) (A) (holding that if the plaintiff intended to

impose on the defendant a duty to use its best efforts to carry out the contract, "it should have done so explicitly").

Accordingly, WirelessMD failed to show evidence of any circumstances prior to the execution of the Purchase Agreement which would allow a jury to find that it is absolutely necessary to imply an obligation for Healthcare to market the software in this case.

(d) WirelessMD contends, however, that the Purchase Agreement includes certain terms that would be illusory or meaningless in the absence of an implied obligation on the part of Healthcare to market the software. "[A] court should, if possible, construe a contract so as not to render any of its provisions meaningless." (Citation and punctuation omitted.) *Vaughn, Coltrane & Assoc. v. Van Horn Constr.*, 254 Ga. App. 693, 695 (563 SE2d 548) (2002). The terms cited by WirelessMD provide for the payment of royalties over a ten-year period in accordance with a formula for calculating net profits, mediation of disputes as to net profits, and quarterly reporting of the net profits regardless of whether sales have occurred, as well as WirelessMD's agreement that it would not compete with Healthcare for seven years. But none of these provisions is inconsistent with Healthcare having the option, but not the duty, to market the software. Accordingly, a construction of the contract finding no duty to market the software would not render these provisions meaningless.

Accordingly, under the circumstances presented in this case, it is not absolutely necessary to imply a contractual obligation for Healthcare to market the software. *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. at 149 (1). The trial court correctly granted summary judgment to Healthcare on WirelessMD's claim that Healthcare breached an implied contractual duty.

2. WirelessMD also contends the trial court erred in granting Healthcare's motion for summary judgment on its breach of contract claim because material issues of fact remain as to whether Healthcare violated an implied covenant of good faith and fair dealing in its performance under the contract. We disagree.

"Every contract implies a covenant of good faith and fair dealing in the performance of the terms of the agreement." (Citation omitted.) *Camp v. Peetluk*, 262 Ga. App. 345, 350 (2) (585 SE2d 704) (2003). "The implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself. As such, the covenant is not independent of the contract." *Stuart Enterprises Intl. v. Peykan, Inc.*, 252 Ga. App. 231, 234 (2) (555 SE2d 881) (2001). See also *Alan's of Atlanta v. Minolta Corp.*, 903 F2d 1414, 1429 (IV) (11th Cir. 1990).

In this case, WirelessMD claims Healthcare violated an implied covenant of good faith and fair dealing when it failed to adequately market the software. But, as we previously found in Division 1, supra,

Healthcare had no contractual duty, either express or implied, to market the software. It follows that Healthcare's failure to market the software cannot show a failure to act in good faith in "the performance of the terms of the agreement." *Camp v. Peetluk*, 262 Ga. App. at 350 (2). See *Paradata Computer Networks v. Telebit Corp.*, 830 FSupp. at 1006 (IV) (B) (court refused to imply a covenant of good faith and fair dealing in marketing plaintiff's products when defendant had no contractual duty to market the products); but cf. *Beraha v. Baxter Health Care Corp.*, 956 F2d 1436 (7th Cir. 1992) (because exclusive license gave defendant the discretion whether to develop and market plaintiff's products, it was bound to exercise that discretion in good faith).

We find the trial court correctly granted summary judgment to Healthcare on WirelessMD's claim of breach of contract through a violation of the implied covenant of good faith and fair dealing.

3. WirelessMD further contends the trial court erred in granting summary judgment to Healthcare on WirelessMD's claim for fraud. Fraud requires a "(1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff." (Citation omitted.) *Pyle v. City of Cedartown*, 240 Ga. App. at 447 (1). Specifically, WirelessMD contends Healthcare represented that it intended to market the software when it knew that it did not intend to do so. See *Benson v. Carter*, 241 Ga. App. 499, 500 (526 SE2d 922) (1999) (fraud can be based on a promise to perform a future act if there is no present intent to perform).

The Purchase Agreement, however, contained a "merger clause" which provided "[t]his Agreement . . . contains the entire agreement and understanding concerning the subject matter hereof between the Parties and specifically supercedes any other agreement or understanding between the Parties related to the subject matter."

> In an action for fraud, if the defrauded party has not rescinded but has elected to affirm the contract, he is relegated to a recovery in contract and the merger clause will prevent his recovery. This result obtains because where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation and his action for fraud must fail. Stated another way, the entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement. Thus, if the contract contains a merger clause, a party cannot argue they relied upon representations other than

those contained in the contract.

(Citations and punctuation omitted.) *Authentic Architectural Millworks v. SCM Group USA*, 262 Ga. App. 826, 827-828 (2) (586 SE2d 726) (2003). Therefore, because WirelessMD has not rescinded the contract, its fraud claim cannot survive unless it can show misrepresentations by Healthcare regarding the marketing of the software that are actually contained in the Purchase Agreement. Id. at 828 (2) (holding that a merger clause does not prohibit a claim based upon a misrepresentation in the contract itself).

To that end, WirelessMD argues that Healthcare's representation that it intended to market the software was an implied term of the contract. But in Division 1, supra, we determined as a matter of law that the Purchase Agreement does not contain an express or implied commitment by Healthcare to market the software. Therefore, WirelessMD cannot show that the contract contains a false representation by Healthcare, and the trial court did not err in granting summary judgment on WirelessMD's fraud claim. *Authentic Architectural Millworks v. SCM Group USA*, 262 Ga. App. at 828 (2).

4. WirelessMD also claims the trial court erred in denying as moot its motion to add another corporation, Quodavx,[7] as a party. As we have affirmed the trial court's grant of Healthcare's motion for summary judgment, WirelessMD cannot show the trial court was mistaken in finding this motion to be moot.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*

DECIDED JANUARY 31, 2005.

*Weiss & Handler, William J. Cornwell*, for appellant.
*Greenberg Traurig, Ernest L. Greer, Joseph H. Akers*, for appellee.

---

[7] Shortly after the execution of the Purchase Agreement, Quodavx, Inc. acquired Healthcare.