## A05A1892. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA v. DOE.

(630 SE2d 85)

ELLINGTON, Judge.

The Board of Regents of the University System of Georgia appeals from the trial court's grant of partial summary judgment to John Doe in this suit for breach of an employment contract. The Board contends the trial court erred in finding that there was a valid, written contract between Doe and the Board and that, because of the existence of such contract, the state's sovereign immunity was waived. The Board also challenges the trial court's finding that it breached its contract with Doe. For the following reasons, we affirm the court's finding that there was a valid, written contract between Doe and the Board, but reverse the court's grant of summary judgment on the issue of whether the Board breached such contract.

"To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law." (Citations omitted.) *WirelessMD v. Healthcare.com Corp.,* 271 Ga. App. 461, 462 (610 SE2d 352) (2005). Our review of the grant or denial of summary judgment is de novo. Id.

So viewed, the record shows the following relevant facts. The Board of Regents ("Board") is a state agency that governs and manages the University System of Georgia and its member institutions, including the Georgia Institute of Technology ("Georgia Tech"). Georgia Tech is not a separate or distinct legal entity from the Board and, therefore, cannot sue or be sued in its own capacity.[1] When an administration or faculty position becomes available at Georgia Tech, university administrators are authorized to search for and interview potential candidates, decide which candidate will be offered the position, present the offer, and negotiate the terms of employment with the candidate on behalf of the Board. When hiring professors or certain administrative personnel, such as provost, vice president, and dean, Georgia Tech then forwards its recommendation for the

---

[1] See *McCafferty v. Med. College of Ga.,* 249 Ga. 62, 65 (1) (287 SE2d 171) (1982) (the college did not have the power to sue and be sued, because such power was vested in the Board of Regents).

appointment to the University System's Chancellor for approval by the Board, pursuant to the Board's policy manual.

In 1997, the Board authorized Georgia Tech to conduct a search for a new dean of the university's DuPree School of Management. The search committee ultimately submitted the names of Doe and two other candidates to Georgia Tech President Wayne Clough and Provost Michael Thomas. In September 1997, following several meetings with Doe, Clough and Thomas decided to offer the position to Doe. At the time, Doe was employed by the business school of another university in the Atlanta area. According to an *Atlanta Journal Constitution* article on September 27, 1997, both Clough and Thomas confirmed that Georgia Tech had named Doe as the new management school dean. On October 6, 1997, Thomas sent a letter to Doe which referred to their previous negotiations about the "opportunity that [Georgia Tech officials] would like [him] to fill," and Thomas proposed specific terms of employment, including salary and fringe benefits. Thomas' letter also solicited from Doe a "formal letter of acceptance" of the offer of employment. The letter included the following statement: "You should understand that the details outlined below are all tentative pending approval of the Board of Regents of the University System of Georgia, however, we anticipate no problem in their approving your appointment." Thomas wrote that, once he received Doe's acceptance letter, he would "secure the approval [of the appointment by] the Board of Regents." Thomas later testified that he had already "offered the position" to Doe prior to sending the October 6 letter, although he characterized the letter itself as the "formal" offer of employment. On October 30, 1997, Doe sent a letter to Thomas accepting the position and the terms of employment offered by Georgia Tech. Notably, the Board has admitted that Doe and Georgia Tech administrators reached an agreement that Doe would become a full professor with tenure and would serve as the Dean of the DuPree School of Management beginning January 1, 1998, but contends such agreement was contingent upon the Board's approval.

In November 1997, Georgia Tech sent a letter to the University System's Senior Vice Chancellor asking the Board of Regents to approve Doe's appointment. Before the Board voted on Doe's appointment, Georgia Tech officials

> announced that [Doe] would be the incoming Dean of the DuPree School of Management[,] . . . allowed [Doe] to meet with faculty regarding administrative matters, allowed and encouraged [Doe] to conduct fundraising activities on behalf of Georgia Tech and . . . publicly introduced [Doe] as the new Dean of the DuPree School on several occasions.

Then, on December 2, 1997, an administrator of the university where Doe was still employed contacted Clough about accusations that Doe had vandalized property on that university's campus. Clough and Thomas discussed the allegations and, according to Thomas, the allegations raised concerns about "behavior that was not something that we would like to have in a dean." Based upon the allegations, Clough and Thomas decided that it would be "impossible" for Georgia Tech to pursue Doe's appointment, so they withdrew the recommendation and the Board did not vote on whether to approve the appointment.

In January 2003, Doe sued the Board of Regents (d/b/a Georgia Tech) for breach of contract. Doe later moved for partial summary judgment on the issues of whether there was a written contract between the parties and, if so, whether the Board had breached the employment contract. In granting Doe's motion,[2] the trial court found that the October 1997 letters between Georgia Tech and Doe contained all of the terms necessary to form a valid, written employment contract. The court noted that the Board had admitted that Georgia Tech officials had the authority to negotiate faculty employment contracts and to extend offers of employment on the Board's behalf. Further, because there was no evidence that the Board had ever rejected a candidate that any of its member institutions had submitted for the Board's ratification, the court stated that it appeared the Board's vote would have been merely "perfunctory."[3] The court also concluded that, to the extent a Board vote was a condition of the contract, "it was a condition of performance rather than a condition of contract formation, as all terms had been negotiated and nothing was subject to future negotiations." The court added that the Board owed Doe "a duty to use its best efforts to fulfill the remaining condition of the contract by recommending [Doe] for approval by the appointed regents and by conducting a vote on [Doe's] employment. [H]owever, [the Board] frustrated the occurrence of this condition and thereby breached the contract." The court also found that, because there was a valid, written contract between the parties as a matter of law, the doctrine of sovereign immunity did not bar Doe's breach of contract suit.

1. On appeal, the Board challenges the trial court's finding that there was a valid, written contract between Georgia Tech and Doe that bound the Board and waived the Board's sovereign immunity as to Doe's breach of contract claim. The issue of whether there was a

---

[2] The Board also filed a motion for summary judgment, which the trial court denied.

[3] Perfunctory is defined as "performed merely as a routine duty; hasty and superficial." Webster's Unabridged Dictionary, Random House, p. 1439.

written contract is critical in this case, because the Georgia Constitution provides that the state's sovereign immunity is waived in suits based upon written contracts. See Ga. Const. 1983, Art. I, Sec. II, Par. IX (c) ("The state's defense of sovereign immunity is hereby waived as to any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies."); see also OCGA § 20-3-36 (sovereign immunity applies to the Board of Regents). The party seeking to benefit from the waiver of sovereign immunity bears the burden of proving such waiver. *Sherin v. Dept. of Human Resources*, 229 Ga. App. 621, 625 (4) (494 SE2d 518) (1997); *Merk v. DeKalb County*, 226 Ga. App. 191 (486 SE2d 66) (1997) (plaintiff must show that contract at issue was in writing in order to demonstrate a waiver of sovereign immunity).

(a) The Board argues that there was no formal written employment contract between Georgia Tech and Doe, but simply an "informal offer" of employment that was explicitly conditioned upon the Board's approval of the appointment. A contract may be formed, however, when the parties exchange mutually interdependent promises. *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 257 Ga. 772, 774 (1) (364 SE2d 556) (1988). Further, a valid written contract may be formed when there are multiple signed, contemporaneous agreements between the parties which demonstrate their intent to enter into a binding contract and the individual documents, considered together, include all of the necessary terms of a contract. *Baker v. Jellibeans, Inc.*, 252 Ga. 458, 459 (1) (314 SE2d 874) (1984).

In this case, the undisputed evidence shows that Georgia Tech officials reached an employment agreement with Doe that included a specific salary, benefits, starting date, and all other necessary terms of employment. Georgia Tech officials and Doe then clearly manifested their intent to be bound by their agreement, even though the Board had not yet approved the appointment, when Doe actively worked on behalf of the university as the "Dean Designee" of the school of management and Georgia Tech publicly announced Doe's appointment on numerous occasions. Under these circumstances, the trial court properly found as a matter of law that there was a written employment contract between Georgia Tech and Doe. See *Baker v. Jellibeans, Inc.*, 252 Ga. at 459 (1); cf. *Bd. of Regents &c. of Ga. v. Tyson*, 261 Ga. 368, 369-370 (1) (404 SE2d 557) (1991) (finding that a patient's informed consent form and medical records at a university-run hospital did not contain all of the terms necessary to constitute a written contract between the Board and the patient that would waive the Board's sovereign immunity for a claim that it failed to provide adequate security).

(b) The Board also argues that the employment agreement between Georgia Tech and Doe explicitly required the Board's vote of

approval and that, without such approval, there was no valid contract. As the trial court properly found, however, the requirement of a vote of approval was a condition of contract performance, not of contract formation. See *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 257 Ga. at 773 (1).

In *Jackson Elec. Membership Corp.*, an electric membership corporation ("E. M. C.") contracted with a business to supply electricity to a new building. The business never applied for membership in the E. M. C., however, and subsequently contracted with another electricity supplier. 257 Ga. at 772. When the E. M. C. sued the business for breach of contract, the trial court found that the contract required the business to be a member of the E. M. C. Id. at 773. Since the business never became a member, the court found that the contract failed for lack of mutuality. Id. On appeal, however, the Supreme Court ruled that a valid contract existed because the parties had exchanged mutually interdependent promises. Id. at 773-774 (1). According to the Court, the additional requirement that the business had to be a member of the E. M. C. was not a condition precedent to the formation or existence of the contract, but was a condition to the existence and enforcement of an immediate right or remedy. Id. The Court also held that the contract included an implied promise for the business to apply for membership in the E. M. C. and for the E. M. C. to grant such membership, and both parties had an implied duty to use their best efforts to fulfill these promises. Id.

As noted in Division 1 (a), supra, Georgia Tech and Doe formed a contract when they exchanged "mutually interdependent promises" that contained all of the essential terms of a contract. *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 257 Ga. at 774 (1). The provision regarding the Board's approval created an implied duty for both parties to exercise good faith in securing such approval. Id. Because Georgia Tech officials were solely responsible for submitting Doe's appointment to the Board, they could not avoid their obligations under the contract by simply refusing to submit the appointment to the Board or by otherwise acting in bad faith to prevent the Board from voting on whether to approve the appointment. See *Carroll v. Harry Norman, Inc.*, 198 Ga. App. 614, 615 (1) (402 SE2d 357) (1991) (when a sales contract is contingent upon the purchaser securing financing, both parties must act in good faith and use their best efforts to ensure that this contingency occurs, and neither may escape their obligation under the contract by failing to fulfill this implied duty). Under the circumstances, the trial court did not err in finding that the Board's approval in this case was a condition of contract performance, not of contract formation.

(c) The Court also found, in the alternative, that to the extent the Board's approval was a condition of the contract, the Board's vote in

this case would have been a mere "perfunctory" act. Although the Board challenges this finding on appeal, it failed to present any evidence to the contrary in the court below.

There appears to be no dispute that, under its broad powers to manage the University System, the Board has the authority to reject appointments to faculty or administrative positions that are recommended by its member institutions. See Division 2 (a), infra. As explained below, however, in determining whether the Board's vote in this case would have been "perfunctory," the relevant question is not whether the Board *could* have voted to reject Doe's appointment, but whether it *would* have rejected it at the time Georgia Tech and Doe entered into the employment agreement.

On that issue, the undisputed evidence shows that Doe was a nationally-recognized administrator and accomplished scholar whose appointment had the enthusiastic support of many Georgia Tech administrators and faculty members, including President Clough and Provost Thomas. In offering Doe the position, Thomas wrote that he "anticipate[d] no problem" with the Board's approval of the appointment. Georgia Tech repeatedly and publicly acknowledged Doe's exceptional qualifications for the position, and used his name and reputation to raise funds for the university. According to Dr. Robert Hawkins, the Dean of Georgia Tech's Ivan Allen College of Management, Policy, and International Affairs, Doe was a "perfect fit" for the position of Dean of the DuPree School of Management. By affidavit, Hawkins also stated as follows:

> In my experience as Dean, which includes submitting at least ten such previous nominations of school chairs and deans to the Board of Regents, and based on my knowledge of [Doe's] qualifications and experience, as of November 30, 1997, a vote by the Board of Regents approving [Doe's] appointment would have been merely a formality.

Moreover, Thomas testified that he could not recall the Board rejecting a single appointment of a dean or a faculty member out of the 150 candidates recommended during his eight years of leadership at Georgia Tech. In fact, there is no evidence in the record to show that the Board has *ever* rejected faculty or administrative appointments recommended by its member institutions. Notably, the official minutes of the Board of Regents' meeting on December 9 and 10, 1997, just days after Georgia Tech officials withdrew Doe's appointment, show that the Board approved the appointments of 63 faculty members at 16 member institutions, including 12 faculty appointments at Georgia Tech. The Board's minutes do not contain any of the names of the newly-appointed faculty members, their positions or salaries,

their qualifications, or any other information that supported the Board's vote of approval. There is also no indication in the minutes that the Board rejected any recommended faculty appointments at that meeting.

Therefore, because there was no evidence to show that, at the time Georgia Tech and Doe executed their employment agreement, there was even a *slight* possibility the Board would have rejected Doe's appointment, the trial court did not err in finding the Board's vote would have been merely perfunctory and that the lack of such vote did not preclude enforcement of the contract. To paraphrase the Supreme Court's query in *Jackson Elec. Membership Corp.*: Would it not defy reason to suggest that the Board, after having authorized Georgia Tech to search for a new Dean, would then refuse to approve the appointment of an exceptionally well-qualified administrator who was the overwhelming choice of Georgia Tech officials? See *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 257 Ga. at 774 (1) (even though the contract required the other party to be a member in the E. M. C., there was no evidence the E. M. C. had ever denied membership to an applicant; the Court found that there was nothing to show that the E. M. C.'s actual acceptance of the party's membership application was "anything more than [a] perfunctory" act that did not preclude enforcement of the underlying contract).

(d) The Board also claims that there was no enforceable contract with Doe because its policy manual requires it to execute a separate, final employment contract after it votes to approve any administrative appointment, and no such contract was executed in this case.[4] This contention lacks merit.

According to the manual, the Board's "Contract for Faculty Ranked Administrators" is a one-page form contract which notifies a new administrator that the Board has approved his or her appointment for a specific salary and period of employment. The undisputed evidence shows that, by the time the Board considers whether to approve the proposed appointment, all of the essential terms of employment have been negotiated by the hiring institution and agreed upon by the administrator. The form contract appears, therefore, to be nothing more than a restatement of a previously negotiated agreement between the hiring institution and the administrator.

---

[4] The Board also claims that it was required to issue an "Administrative Appointment Letter" to Doe before his appointment as Dean could be considered final. This document, however, is a four-sentence form letter which simply notifies a newly appointed administrator that the Board has approved his or her appointment. It requires no acceptance or other action on the part of the administrator and clearly is not a contract. The Board has not demonstrated why its failure to issue this letter should negate the express terms of a prior written contract.

The evidence also shows that Georgia Tech officials and Doe had agreed upon all of the essential terms of an employment contract in October 1997, and there was no evidence that the Board would have rejected Doe's appointment under those agreed-upon terms. Therefore, to the extent that the Board's policy manual requires the execution of a form contract which simply restates those terms, such requirement is, like the vote that would have preceded it, merely a formality that does not preclude enforcement of the underlying contract. See Division 1 (c), supra.

Moreover, the Board's form employment contract clearly shows that it is the president of the hiring institution, *not* the Chancellor or other Board representative, who signs the document on behalf of the Board, and the appointee is instructed to sign and return the document to the institution, *not* the Board. This certainly undermines the Board's claim that its member institutions are not authorized to enter into employment contracts on its behalf. See Division 2 (b), infra.

2. The Board contends that Georgia Tech did not have the authority to enter into an employment contract with Doe that would bind the Board because the Board, alone, is vested with the "exclusive constitutional and statutory authority" to manage and control the University System. It argues that this exclusive authority includes the hiring of university administrators and faculty members, and implies that such authority cannot be delegated to its member institutions. According to the Board, Doe's employment contract with Georgia Tech was the result of the Georgia Tech officials' unauthorized acts and was, therefore, invalid.

(a) The Board of Regents is vested with the power to manage and control the University System, and the duties and powers of the Board are set forth in the Georgia Code. Ga. Const. 1983 Art. VIII, Sec. IV, Par. I (b); OCGA §§ 20-3-21; 20-3-31. In managing its member institutions, the Board's powers are plenary,

> untrammeled except by such restraints of law as are directly expressed, or necessarily implied. Under the powers granted, it becomes necessary to look for limitations, rather than for authority to do specific acts. Limited only by their proper discretion and by the Constitution and law of this State, they may exercise any power usually granted to such corporations.

(Citation and punctuation omitted.) *Villyard v. Regents of Univ. System &c.*, 204 Ga. 517, 520 (50 SE2d 313) (1948) (finding that a state college could lawfully offer discounted services to its students and faculty because there was no express or implied legal limitation on its authority to do so). See also OCGA § 20-3-31 (4) (the Board of Regents has the power "[t]o exercise any power usually granted to

such corporation, necessary to its usefulness, which is not in conflict with the Constitution and laws of this state"). In addition to conveying this broad authority to the Board, the legislature specifically empowered the Board to hire faculty members and administrators, to set their salaries, and to fire them when it deems it appropriate. OCGA § 20-3-31 (2). There is nothing in the Code, however, which prohibits the Board from delegating these functions to its member institutions.

The legislature also authorized the Board to set up rules and regulations which it deems necessary to manage the University System. OCGA § 20-3-31 (1). These rules and regulations are included in the Board's Policy Manual, which expressly authorizes the presidents of its member institutions to enter into certain types of contracts on behalf of the Board. The manual also authorizes the member institutions to do the following without the Board's approval: establish written policies and procedures for recruiting faculty members; set salaries for all faculty members; hire lecturers; establish evaluation criteria and evaluate faculty members; and fire administrators and faculty members. The manual also authorizes the member institutions to hire chaired professors, provosts, vice presidents, and research university deans on an interim basis. While the manual directs the member institutions to forward recommendations for new administrators and chaired professors to the Board for approval, there is nothing in the manual that prevents the Board from waiving this provision or from delegating its hiring authority to its member institutions.

Accordingly, the Board has failed to show any legal limitation that prevents it from delegating to its member institutions the authority to enter into employment contracts on the Board's behalf.

(b) The Board also argues that, even if it could delegate such authority, it did not authorize Georgia Tech to enter into an employment contract with Doe on its behalf. The Board admitted, however, that Georgia Tech routinely searches for candidates to fill faculty openings and chooses which candidates to hire, then "makes offers to the candidates and negotiates terms of employment with them *on behalf of the Board of Regents*." (Emphasis supplied.) Further, there is no evidence in the record to even suggest that the Board, itself, searches for faculty members or administrative employees to fill vacancies at its member institutions, or that it interviews candidates, issues employment offers, or negotiates with them regarding the terms of employment agreements. Instead, the undisputed evidence shows that the Board relies on its member institutions to carry out these tasks, to reach a comprehensive employment agreement with candidates on its behalf, and to present the final agreements to the Board for its approval. Absent any evidence to the contrary, the

Board's involvement with new faculty and administrative appointments appears to be, by choice or necessity, limited to voting on whether to approve or reject the appointments under the terms presented by the hiring institution.

Accordingly, the evidence supports Doe's contention that the Board had authorized Georgia Tech to execute an employment agreement with him on the Board's behalf.

3. The Board claims that the trial court erred in finding as a matter of law that it breached the employment contract with Doe by failing to use its best efforts to ensure that it conducted a vote on Doe's appointment. According to the trial court, the Board unilaterally "frustrated the occurrence" of the vote and prevented the performance of the contract. Because there is conflicting evidence on this issue, however, we conclude the trial court erred in finding as a matter of law that the Board breached the agreement and in granting summary judgment on this issue to Doe.

"A breach of contract may arise in any one of three ways, namely: by renunciation of liability under the contract; by failure to perform the engagement; or by doing something which renders performance impossible." (Citation and punctuation omitted.) *Feagin v. Feagin*, 174 Ga. App. 474, 475 (330 SE2d 410) (1985). In this case, as part of the employment agreement with Doe, Thomas promised to submit Doe's appointment to the Board and to secure the Board's approval. It is undisputed that Georgia Tech officials did, in fact, submit Doe's appointment to the Board for approval, as promised.

Before the Board voted, however, Doe acted in such a manner that he was accused of vandalizing a campus building at the university where he was still employed. After learning of the accusations, Clough discussed the situation with the University Chancellor, who indicated that "he could not imagine that [Georgia Tech] would decide to continue with its recommendation that [Doe] be appointed." Clough and Thomas decided that Georgia Tech should not pursue Doe's appointment, and they met with Doe to discuss the decision. Doe insisted that he had not committed the alleged vandalism, and Thomas described him as being "disheartened" by Georgia Tech's decision to withdraw the appointment. Then, on December 4, 1997, Doe wrote a letter to Thomas and suggested that, if Clough and Thomas "still [felt] the need to move on" and to withdraw his appointment, Georgia Tech should issue the following statement:

> [Doe's] personal health situation . . . makes it impossible for him to undertake his new responsibilities as Dean of The DuPree School of Management on the previously reported schedule. . . . Neither [Doe] nor Georgia Tech are happy about this situation, but we both agree. Therefore, [Georgia

Tech has] requested that [Doe] withdraw his acceptance of our informal appointment and [Doe] has graciously agreed to our reluctant request.

Under the circumstances, a jury issue remains as to whether the Board breached the employment agreement by failing to conduct a vote on Doe's appointment and refusing to honor the express terms of the written contract. Further, even if the Board's vote of approval would have been merely perfunctory, jury issues exist as to whether Georgia Tech officials violated their implied duty to use their best efforts to secure the Board's approval of Doe's appointment, whether Georgia Tech officials acted in bad faith when they withdrew the appointment, and whether Georgia Tech officials were solely responsible for the failure of the Board to vote on the appointment. See *Carroll v. Harry Norman, Inc.*, 198 Ga. App. at 616 (1) (evidence did not demand a finding that appellant breached the contract by failing to act diligently and in good faith; therefore, appellee was not entitled to summary judgment). There are also jury issues as to whether Doe's actions before the Board's vote rendered Georgia Tech's continued pursuit of the appointment impossible or impracticable, and whether Doe subsequently agreed to or otherwise ratified the withdrawal of his appointment. See *Feagin v. Feagin*, 174 Ga. App. at 475 (one party cannot recover for a breach of contract when he acted in such a way as to frustrate the other party's performance of the contract). Accordingly, the trial court erred in finding as a matter of law that the Board unilaterally breached its agreement with Doe and in granting summary judgment on this issue to Doe.

*Judgment affirmed in part and reversed in part. Smith, P. J., and Adams, J., concur.*

DECIDED MARCH 29, 2006 —
RECONSIDERATION DENIED APRIL 14, 2006 — ▮▮▮▮▮▮▮

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, Bryan K. Webb, Senior Assistant Attorney General, Ralph W. Ellis, Assistant Attorney General*, for appellant.

*Balch & Bingham, T. Joshua Archer, Michael J. Bowers, Warren N. Sams III*, for appellee.