**THIRD DIVISION
BARNES, P. J.,
BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**March 25, 2015**

# In the Court of Appeals of Georgia

A14A1851. BOARD OF REGENTS OF THE UNIVERSITY BR-094
    SYSTEM OF GEORGIA v. WINTER.

BRANCH, Judge.

Peter Winter brought suit against the Board of Regents for breach of an employment contract. The Board appeals the trial court's denial of its motion for summary judgment. As a part of its ruling, the trial court conclusively denied the Board's claim of sovereign immunity, thereby authorizing this direct appeal under the collateral order doctrine. See *Bd. of Regents &c. Ga. v. Canas*, 295 Ga. App. 505, 507 (1) (672 SE2d 471) (2009). For the reasons that follow, we reverse and remand for entry of summary judgment in favor of the Board.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We

review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).[1]

Construed in favor of Winter, the record shows that in May 2005, Winter, a British citizen and postdoctoral research scholar who was finishing a research fellowship at the University of Kansas ("UK"), contacted and began negotiations about postdoctoral employment with Dr. Rene Alvarez in the Department of Infectious Diseases ("DID") at the College of Veterinary Medicine at the University of Georgia ("UGA"). Meanwhile, because Winter's "J-1" educational exchange visa that enabled him to work at UK was about to expire, Winter applied to the United States Citizenship and Immigration Services ("USCIS") for a change of status ("COS") to a "B" visitor/tourism visa, which does not allow employment, to cover the time until he could obtain another position. In a series of emails, Winter and Alvarez then negotiated the terms of his possible employment at UGA, including his salary and start date. In three successive emails on June 2, Alvarez stated that if Winter was

[1] Winter did not file any affidavits or other sworn testimony in response to the Board's motion for summary judgment, and he was not deposed. He relies solely on the documents produced in discovery. Accordingly, there is no testimony in the record from Winter regarding any conversations that he had in connection with his negotiations with UGA for employment.

still interested, he could draw up a formal offer and begin the necessary paperwork; Winter responded that he "would be interested. . . and . . . look[ed] forward to receiving the formal offer"; and Alvarez replied that a formal offer would be forthcoming and "I am glad you have chosen to join our labs." Winter asserts in his brief that by this email, Alvarez acknowledged Winter's acceptance of the offer of employment.

On June 6, Alvarez sent to Winter a written offer of a postdoctoral fellowship in the DID. The letter outlined the job duties and provided a term of one year beginning July 1 with a salary of $38,712, "pending approval by [UGA]." On the same day, Alvarez sent a revised letter identical to the first but containing a start date of August 1 and omitting the condition that the offer was subject to UGA approval. Although Winter may have indicated that he was British, neither letter referred to Winter's immigration status. Winter did not thereafter accept the formal offer in writing. At the time, the Board of Regents had a policy of not providing post-doctoral fellows a written employment agreement.

Through the remainder of June, Winter and UGA corresponded about the paperwork that UGA required in connection with his employment and about how UGA would assist with getting Winter the correct visa. Internal UGA documents

3

show that on June 23, Alvarez wrote to the DID chair, seeking his approval of hiring Winter and stating that "[w]e are trying to get Dr. Peter Winter started in our lab as a postdoctoral fellow."

Meanwhile, on June 28, in connection with Winter's COS, USCIS sent Winter a "request for evidence" ("RFE") and stated that Winter's COS was being held pending his response, which was not due until September 20. As evidenced by a subsequent series of writings, Winter and DID began to discuss the steps necessary to change Winter's immigration status to "H-1B" for temporary employees, so that he could be employed at UGA.[2] In early July, DID staff sought assistance from UGA's International Student, Scholar and Immigrations Services Office ("ISSIS"). ISSIS initially decided to wait for USCIS to approve Winter's COS application before submitting an H-visa application; ISSIS also learned that Winter had not responded to the RFE. By now it was late July, and Winter relocated to UGA on July 24.

At the beginning of August, Winter met with ISSIS about his H-visa application and was told that UGA could not submit an H-visa application until Winter responded to the RFE. Winter therefore responded to the RFE on August 2

---

[2] The applicable federal regulations provide that it is the employer seeking to employ a qualifying temporary employee who must petition for H-1B status. 8 CFR § 214.2 (h) (l) (i) & (2) (i) (A).

4

and provided a copy of his response to UGA. ISSIS then told Winter that UGA could not submit the H-visa application until Winter's COS application was approved and he was given a B-visa.[3] After reviewing Winter's response to the RFE, ISSIS determined that UGA could not proceed with the H-visa application because Winter did not mention in his response to the RFE that he planned to work at UGA starting August 1, 2005.

Because UGA would or could not proceed on his H-visa application, and with advice from ISSIS, Winter turned to an alternative approach, which was to seek reinstatement of his J-1 visa at UK and have it administratively transferred to UGA. ISSIS advised Winter that he would need to withdraw his pending COS in order to seek reinstatement of his J-1 status and that failure to do so could mean that his COS would be granted, changing his J status to B, and making him unemployable.[4] Winter

---

[3] The record, however, contains a signed letter dated July 14 from the head of DID to USCIS requesting H-1B status for Winter for the period August 1, 2005 to June 30, 2006.

[4] UGA is precluded by law from employing a person with a tourist visa. See 22 CFR § 41.31 (b) (1) (2).

took the necessary steps, and on August 11, he informed UGA that UK had reinstated his J visa and transferred it to UGA. [5]

On August 12 and the following days, several documents were signed in connection with Winter's employment at UGA. A department head signed a UGA form that reflected that Winter's "start/contract" date was August 1, that he was eligible for benefits, and that he had been assigned an employee identification number. That same day, Winter signed an Intellectual Property Agreement (the "IP agreement") with UGA that stated that "[a]s part of the consideration for my employment by [UGA], I understand and agree that [UGA] and the [UGA] Research Foundation, Inc., have an interest in any intellectual property that I may make or develop while an employee of the University"; a DID department representative signed this agreement as a witness. Winter also signed a Board of Regents Loyalty Oath (swearing loyalty to the constitutions of the United States and Georgia) as "an employee of the University System of Georgia." Three days later, both Winter and a UGA representative signed a State Department form regarding Winter's eligibility for J-1 visa status. The next day, a DID department head signed a UGA "Employee

_____

[5] An office manager/administrative assistant for DID averred in an affidavit that Winter's start date was extended to September 1, but the affidavit does not state when this occurred.

6

Personnel Report" instructing an employee to put Winter on the payroll for one month and stating that Winter would become a "postdoc" in September.

Unfortunately, also on August 12, USCIS mailed an approval of Winter's application for a visitor/tourism visa, and by August 17, the parties learned that Winter's status had changed from J to B and that he was now unemployable in the United States. UGA told Winter that his only remaining option would be to again pursue an H-visa, and UGA left the process in Winter's hands, refused to pay a $1,000 expediting fee that would have accelerated the process of obtaining an H visa, and gave Winter a deadline of September 16 to show proof that he had obtained the necessary visa. Winter did not or could not obtain the H visa at that time, and on September 14, UGA sent a letter to Winter stating that it was withdrawing its "offer" of employment because Winter had not obtained the appropriate visa status in a timely fashion to work at UGA. Consequently, Winter filed suit for breach of contract in the State Court of Fulton County. After the trial court denied the Board's motion for summary judgment, we granted the Board's application for interlocutory review.

On appeal, the Board contends the trial court erred by denying summary judgment to the Board for three reasons: (1) the State Court of Fulton County is not the proper venue for this action because Georgia law places venue exclusively in the

7

Superior Court of Fulton County; (2) the Board is entitled to sovereign immunity because there is no signed written contract between the parties and the Board's sovereign immunity is only waived for actions ex contractu; and (3) even if there was a written contract, UGA was authorized as a matter of law to rescind any employment agreement because Winter lacked the appropriate visa to legally work for UGA.

1. We first reject the Board's argument that the trial court did not have jurisdiction of Winter's suit. The Board claims that OCGA § 50-21-1 requires that all breach of contract claims against the Board of Regents must be brought in the Superior Court of Fulton County. This Code section provides that sovereign immunity is waived "as to any action ex contractu for the breach of any written contract. . . entered into by the state, departments and agencies of the state, and state authorities." OCGA § 50-21-1 (a). It also provides:

> Venue with respect to any such action *shall be proper* in the Superior Court of Fulton County, Georgia. The provisions of this subsection shall be cumulative and supplemental to any other venue provisions permitted on April 12, 1982, or thereafter permitted by law.

OCGA § 50-21-1 (b) (emphasis supplied). The Board contends the wording "shall be proper. . ." requires that breach of contract actions against the state be brought in the specified court. This plain language, however, only means that venue cannot be

8

contested in the specified court. Compare OCGA § 50-21-28 (which provides, among other things, that tort actions against the state "*shall be brought* in the state or superior court of the county wherein the loss occurred") (emphasis supplied). Moreover, the plain meaning of the last sentence of subsection (b), shows that venue for such a claim is not exclusive to the Superior Court of Fulton County, but rather that venue in that court "*shall be* cumulative and supplemental to" other legal venue. (Emphasis supplied.) Accordingly, the trial court had jurisdiction of Winter's suit.

2. The Board contends the trial court erred by denying that it is entitled to sovereign immunity as a matter of law. As shown above, the defense of sovereign immunity, which applies to the Board of Regents, is waived as to any action "ex contractu for the breach of any written contract." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (c); see also OCGA § 20-3-36 (sovereign immunity applies to the board of regents); *Bd. of Regents of Univ. System of Ga. v. Barnes*, 322 Ga. App. 47, 49 (2) (743 SE2d 609) (2013) (same). Any waiver of immunity must be strictly followed, "and an implied contract will not support a waiver of immunity under the provisions of the Georgia Constitution." Id. at 50 (2) (citation omitted). The party seeking to benefit from the waiver, here Winter, has the burden of proving a waiver of immunity and, therefore, the burden of proving the existence of a written contract. Id. at 49-50

9

(2). For the following reasons, we hold that even if there was an agreement between the parties, that agreement was not in writing, and therefore the Board's sovereign immunity was not waived.

(a) The parties clearly did not enter into a formal, traditional written agreement that both parties signed. The Board had a policy of not providing post-doctoral fellows a written employment agreement, and there is no evidence of such an agreement in the record. Also, Winter argues in his brief that he accepted the Board's offer via email on June 2, two months before he signed any documents in connection with his employment. There is no evidence whatsoever of a written employment agreement dated at or about the time that Winter contends he accepted employment.[6]

---

[6] Winter's argument that pursuant to the former Georgia Electronic Records and Signature Act (Ga. L. 1997, p. 1052, § 1) his emails constituted signed writings sufficient to establish a written agreement for purposes of waiving sovereign immunity is without merit. That act, which was replaced by the Georgia Uniform Electronic Transactions Act in 2009 (Ga. L. 2009, p. 698, § 2), provided, among other things, that "[w]hen a rule of law requires a signature, an electronic signature satisfies that rule of law." OCGA § 10-12-4 (d) (2005). And an "electronic signature" was defined as "a signature created, transmitted, received, or stored by electronic means and includes but is not limited to a secure electronic signature. OCGA § 10-12-3 (2005). But Winter has not provided any evidence that he provided an electronic signature at any time during his negotiations with UGA. Moreover, the 1997 act also provided that "[n]othing in this chapter shall be construed to require any department, agency, authority, or instrumentality of the state or its political subdivisions to create, send, receive, store, recognize, accept, be bound by, or otherwise use electronic records or electronic signatures." OCGA § 10-12-4 (i) (1). And Winter has not shown that the Board ever elected to be bound by electronic signatures at that time.

(b) Winter has not carried his burden of showing that the parties entered into signed contemporaneous writings sufficient to establish a written contract. He makes three arguments.

(i) Winter contends the June 6 offer signed by Alvarez together with documents he signed on August 12 constitute signed contemporaneous writings. We disagree. A written contract can consist of multiple documents "as long as all the necessary terms are contained in signed contemporaneous writings." *Baker v. Jellibeans, Inc.*, 252 Ga. 458, 460 (1) (314 SE2d 874) (1984) (multiple documents meeting this test satisfy the statutory requirements and purpose of the Statute of Frauds); *Bd. of Regents v. Tyson*, 261 Ga. 368, 369 (404 SE2d 557) (1991) (applying reasoning of *Baker* to question of ex contractu waiver of sovereign immunity). "Contemporaneous" in this setting does not "connote perfect or absolute coincidence in point of time" and has been held to mean "reasonably contemporaneous." *Dabbs v. Key Equip. Finance*, 303 Ga. App. 570, 574 (694 SE2d 161) (2010) (citation, punctuation and footnote omitted); see also *Manry v. Hendricks*, 66 Ga. App. 442, 453 (18 SE2d 97) (1941) ("One thing is contemporaneous with a given transaction when it is so related in point of time as reasonably to be said to be a part of such transaction."). Nevertheless, a nine-week interval between the execution of

11

documents strongly suggests that those documents are not contemporaneous. See

*Newell Recycling of Atlanta v. Jordan Jones & Goulding*, 317 Ga. App. 464, 466-467

(731 SE2d 361) (2012) (documents dated three months apart are not

contemporaneous).[7]

In addition, the June events and the August 12 events strongly suggest that two

different events or transactions occurred at those times, not one. More specifically,

Winter contends he accepted UGA's offer in June; in other words, the parties entered

into an agreement at that time and that event was concluded. Two months then passed

during which Winter moved to Athens, which is consistent with Winter's

understanding that he already had an employment agreement, which, as we have

already shown, was not in writing. Then in early August, Winter and UGA continue

to attempt to resolve Winter's visa issues and eventually sign several employment-

---

[7] Compare *Patterson v. Bennett Street Properties*, 314 Ga. App. 896, 900 (1) (726 SE2d 147) (2012) (guaranty and two other agreements were signed within three days and were part of the same transaction); *Hong Investments v. Sarsfield*, 312 Ga. App. 82, 83 (717 SE2d 679) (2011) (lease and guaranty executed one day apart were sufficiently contemporaneous and part of the same transaction); *Bd. of Regents of the Univ. System of Ga. v. Doe*, 278 Ga. App. 878-879 (630 SE2d 85) (2006) (documents signed 24 days apart were contemporaneous); *Manry*, 66 Ga. App. at 453-454 (documents dated six days apart in the same transaction held to be contemporaneous); *Marietta Sav. Bank v. Janes*, 66 Ga. 286, 288-289 (1881) (contract in writing even though comprised of a note and letters dated 20 days apart).

related documents on August 18. These events in early August are not only separate in time from the events of early June but reflect that the parties were engaged in a completely separate activity, finalizing administrative details related to Winter's employment. Thus, the significant time interval between the June 6 and August 12 combined with the behavior of the parties shows that the June documents and the August documents should not be treated as contemporaneous in this case. Accordingly, the June and August documents do not constitute signed contemporaneous writings sufficient to establish a written agreement for the purpose of waiving sovereign immunity.

(ii) Winter also argues that both parties signed contemporaneous documents on August 12 that constitute signed contemporaneous writings sufficient to constitute a written agreement; he cites the Loyalty Oath, the IP agreement, and the State Department certificate of eligibility for J-1 visa status. This argument, too, is without merit. First, these documents do not include all of the terms and conditions of Winter's alleged employment agreement. *Tyson*, 261 Ga. at 369 (no written agreement where multiple contemporaneous documents did not contain all the necessary terms of agreement). Second, the only document of the three signed by someone from UGA is the State Department certificate, which was obviously signed

13

for the purpose of complying with federal regulations and not as a part of an employment contract. Thus, Winter has not shown that UGA signed any documents on or about August 12 that relate to the terms of his employment. The only other documents that we have found in the record dated on or about August 12 that are signed by UGA officials are clearly internal administrative forms and not documents whereby UGA purports to enter into employment terms with Winter.

In short, Winter has failed to show that the parties signed on or about August 12, contemporaneous writings that contain the necessary terms of employment as required by *Baker v. Jellibeans*, 252 Ga. 458 (1). The case of *Bd. of Regents v. Doe*, 278 Ga. App. 878, upon which Winter relies, is distinguishable. In that case, Georgia Tech sent a written offer that contained all the necessary terms of an employment agreement, including a specific salary, benefits, and starting date; the letter also requested a "formal letter of acceptance." Twenty-four days later, the plaintiff accepted the offer in writing and the court held that there was a written agreement. Id. at 879, 881 (1) (a).

(iii) Winter also argues that a reference to consideration in the IP agreement somehow proves that the parties signed contemporaneous writings containing the necessary terms of employment. We disagree. Although, as stated in the IP

14

agreement, Winter signed the IP agreement "[a]s part of the consideration for [his] employment," that language cannot override the above reasoning, i.e., that the June 6 offer was not contemporaneous with the August 12 documents and that the August 12 documents standing alone were insufficient to establish a written agreement. Further, the IP agreement standing alone addressed only one aspect of Winter's employment and it was not signed by UGA.

For the above reasons, we conclude that Winters has not carried his burden of showing that the Board of Regents waived its sovereign immunity for a claim of breach of contract. See *Ga. Dept. of Community. Health v. Data Inquiry*, 313 Ga. App. 683, 686-687 (1) (b) (722 SE2d 403) (2012) (without evidence of signed contemporaneous agreements plaintiff failed to carry burden of showing existence of a written contract for the purpose of waiving sovereign immunity). The trial court's decision is therefore reversed and the case remanded for entry of summary judgment in favor of the Board of Regents.

3. The Board's final enumeration of error is therefore moot.

*Judgment reversed and case remanded with direction. Barnes, P. J., and Boggs, J., concur*.

15