## A11A0384, A11A0385. COCA-COLA BOTTLERS' SALES AND SERVICES COMPANY LLC v. NOVELIS CORPORATION; and vice versa.

(715 SE2d 692)

SMITH, Presiding Judge.

In this contract dispute, Coca-Cola Bottlers' Sales and Services Company LLC ("CCBSS") and Novelis Corporation ("Novelis") appeal from the trial court's rulings on cross-motions for summary judgment. In Case No. A11A0384, CCBSS appeals from the trial court's grant of summary judgment in favor of Novelis on CCBSS's claim for breach of contract, and in Case No. A11A0385, Novelis appeals from the trial court's grant of summary judgment to CCBSS on Novelis's counterclaims and affirmative defenses. We affirm in part and reverse in part in Case No. A11A0384, and we affirm in Case No. A11A0385.

On appeal from the grant or denial of summary judgment, we apply a de novo standard of review. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997). "The moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Punctuation omitted.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). See also OCGA § 9-11-56 (c).

The record reveals that in 2005, CCBSS and Novelis entered into a "Soft Toll Agreement" ("STA") for aluminum can stock under which CCBSS directs its can manufacturers to purchase aluminum can sheet from Novelis for fabrication into can bodies, ends, and tabs in return for certain marketing payments.[1]

In 2007, CCBSS sued Novelis for breach of contract for offering more favorable prices "on both elements of the price of the can sheet: the aluminum price and the fees charged to convert that metal into sheet for beverage cans" to two of CCBSS's competitors in violation of the STA. CCBSS asserted breach in the form of a metal price claim and a conversion cost claim. Novelis counterclaimed for a declaratory judgment, unjust enrichment, and restitution; it also asserted several affirmative defenses claiming that the STA is unenforceable because Exhibit A, a list of CCBSS's members, was not attached though referenced by the STA.

Following extensive discovery, CCBSS moved for summary judgment on Novelis's counterclaims and Novelis's second, third, fourth,

---

[1] The STA provides that it is governed by the laws of the State of New York. And "[u]nder the rule of lex fori, procedural or remedial questions are governed by the law of the forum, the state in which the action is brought." (Citation and punctuation omitted.) *Bunker Hill Intl. v. Nationsbuilder Ins. Svcs.*, 309 Ga. App. 503, 506 (1) (710 SE2d 662) (2011).

and fifth affirmative defenses, and Novelis moved for summary judgment on CCBSS's second amended complaint. The trial court granted CCBSS's motion for summary judgment and granted summary judgment to Novelis on CCBSS's breach of contract claims and its claim for attorney fees. It is from these orders that the parties appeal.

## Case No. A11A0384

At issue here is Paragraph 14 of the STA titled "Most Favored Nations" ("MFN"). This provision states:

> If, taking into account all conversion price related incentives, discounts (including with respect to the metal price, only new discounts to the applicable LME[2]-based price offered from the signature date on this Agreement), rebates, credits, scrap spreads and the like but not "Investment Related Discounts" (Investment Related Discounts include investment related discounts initiated before January 1, 1997 and any discount, not to exceed $250,000 per year per C[an]M[anufacturer]/customer, initiated after January 1, 1997 that is put in place to offset or partially offset the costs associated with Investments made to grow the aluminum can business or that are otherwise beneficial to Novelis), Novelis, or any Novelis Affiliate, offers (offer includes any offer or proposal, including, but not limited to, those initiated by Novelis or those made in response to a request, initiative, or counter of another purchaser), to any customer, or other user of Aluminum Can Stock, for delivery in North America,
>
> (A)    a lower conversion cost/lb for at least three months or consecutive periods totaling at least three months, not to exceed three months in a year, or
>
> (B)    any other element, except Investment Related Discounts, that makes the conversion cost/lb more advantageous as a whole to the customer,
>
> then the elements included in such offer shall be offered to the Members through CCBSS for the same duration covered by the offer to the other customer. CCBSS, on behalf of Members, may accept or decline the offer for its volume. If accepted, the Marketing Payments will be adjusted so that

---

[2] London Metal Exchange.

the Members are not disadvantaged when the conversion cost/lb offered to the other customer (excluding Investment Related Discounts) is compared to the conversion price invoiced to the CM's less the Marketing Payments payable to CCBSS under this Agreement. If requested by CCBSS, Novelis will certify to CCBSS, at the beginning of each year, by letter from Novelis' chief financial officer that it is complying with this section of the Agreement. If requested by and paid for by CCBSS, CCBSS may nominate an outside auditor, to be agreed to by Novelis, to certify that Novelis is complying with this section of the Agreement. In no way will these audit rights jeopardize confidentiality of Novelis'[s] other customers or provide CCBSS with competitive information.

1. CCBSS contends that the trial court erred in granting summary judgment to Novelis on its claim that Novelis offered better metal prices to CCBSS's competitors in violation of the MFN; in particular, the following provision: "discounts (including with respect to the metal price, only new discounts to the applicable LME-based price offered from the signature date on this Agreement)." CCBSS contends that Novelis breached by offering "new discounts" after the "signature date" of the STA to two of CCBSS's competitors, Anheuser Busch ("A-B") and Crown Cork and Seal ("Crown"). Novelis counters that summary judgment was proper because its contracts with A-B and Crown pre-dated the signature date of the STA, and therefore any discounts were not *new* discounts and were not offered *after* the signature date of the STA. We agree that the grant of summary judgment was proper on this claim, but for a different reason.

Under New York law, "it is axiomatic that when the provisions of a contract are clear and unambiguous, the interpretation thereof is a question of law and effect must be given to the parties' expressed intent." (Citations and punctuation omitted.) *Singh v. Dyckman*, 202 AD2d 412, 413 (608 NYS2d 497) (1994). And "a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." (Citation and punctuation omitted.) *Norma Reynolds Realty v. Edelman*, 29 AD3d 969, 969 (817 NYS2d 85) (2006). The relevant portion of the MFN provides:

*If, taking into account* all conversion price related incentives, discounts (including with respect to the metal price, only new discounts . . . offered from the signature date on this Agreement), rebates, credits, . . . [,]Novelis . . .

> offers . . . to any customer . . . a lower conversion cost/lb . . . or any other element . . . that makes conversion cost/lb more advantageous to the customer,

Novelis must make the same offer to CCBSS. (Emphasis supplied.) Under the plain language of this provision, "discounts" is one of several factors to be "tak[en] into account" if Novelis offers another customer a lower conversion price per pound. The term "discounts" is defined in part as new metal price discounts offered from the signature date of the STA. Therefore, as a "discount," i.e., a new metal price discount offered from the signature date of the STA, is *only a factor* to be "tak[en] into account" in determining whether Novelis offered a customer a lower conversion cost per pound.

In simple terms, the MFN provides that if Novelis offers another customer a lower conversion cost per pound, then it must also make the same offer to CCBSS. Contrary to the arguments presented by the parties, the MFN is *not* triggered by Novelis offering a new metal discount after the signature date; it is triggered by Novelis offering *a lower conversion cost per pound*, which is determined by "taking into account" discounts (including new discounts) and other factors. CCBSS therefore cannot sue Novelis for breach of a duty that does not exist under the terms of the contract. See, e.g., *428 Camera Corp. v. Tandy Corp.*, 272 AD2d 72, 72-73 (707 NYS2d 101) (2000) (no cause of action for breach of contract where sublease did not obligate tenant to repair or replace heating system); *Merritt Hill Vineyards v. Windy Heights Vineyard*, 94 AD2d 947, 947-948 (463 NYS2d 960) (1983) (where there is no duty to perform, nonperformance cannot constitute a breach of contract). The trial court therefore did not err in granting summary judgment to Novelis on CCBSS's claim that Novelis breached the MFN by offering a new metal price discount to A-B and Crown.[3]

2. CCBSS argues that genuine issues of material fact exist regarding Novelis's breach of the MFN provision providing A-B and Crown with a lower conversion cost per pound without also offering CCBSS the same conversion cost. The MFN provides that if Novelis offers to another customer "(A) a lower conversion cost/lb for at least three months or consecutive periods totaling at least three months, not to exceed three months in a year, or (B) any other element . . . that makes the conversion cost/lb more advantageous as a whole to the customer," Novelis must make the same offer to CCBSS. The STA provides no specific method for calculating conversion cost per pound.

---

[3] "We will affirm a grant of summary judgment if it is right for any reason." (Citation, punctuation and footnote omitted.) *Johnston v. Crescent Bank and Trust Co.*, 304 Ga. App. 192, 192 (695 SE2d 305) (2010).

CCBSS presents several arguments supporting its claim that Novelis offered a lower conversion cost per pound to A-B and Crown. It first points to the testimony of a witness designated by Novelis under OCGA § 9-11-30 (b) (6) to respond to pricing issues. This witness acknowledged that in 2008, on a "gauge-by-gauge basis, Novelis charged [A-B] a lower conversion price for [A-B] directed volume than it charged [A-B] for CCBSS directed volume for the same type of can stock, even taking into account the marketing payment CCBSS received."[4] She stated further that Novelis charged Crown a lower conversion cost for Crown direct volume than it charged Crown for CCBSS directed volume taking into account the rebate Novelis paid CCBSS. Novelis argues that the witness "compar[ed] prices on particular gauges [(thicknesses)] without taking into account the additions and subtractions required by the MFN."

Next, CCBSS argues that the trial court erred in relying on Novelis's methodology because it was not mentioned in the MFN, not agreed to by CCBSS, and was flawed. CCBSS's expert averred that instead of comparing CCBSS's net prices to the net prices of A-B and Crown, Novelis used a weighted average conversion fee that does not accurately reflect the net price per pound charged to A-B for A-B directed purchases pursuant to A-B's supply agreement with Novelis. He stated further that

> [i]nstead of calculating the actual net conversion fee charged to A-B for A-B Directed can sheet purchases and then comparing that price to the net conversion fee invoiced for CCBSS Directed Volume less the Marketing Payments, what Novelis has done is to calculate a blended price based on a weighted average of the lower conversion fees applicable to A-B Directed Volume *and* the higher conversion fees applicable to CCBSS Directed Volume. Novelis uses the blended price to derive an amount it terms the "A-B Discount," which it then compares to the unblended CCBSS Marketing Payments for each type of can sheet.

(Emphasis in original.) CCBSS's expert concluded that for this and other reasons, "the methodology used by Novelis does not accurately calculate Novelis's compliance with the MFN."[5]

---

[4] There was evidence presented that both A-B and Crown purchased Can Body Stock ("CBS"), Can End Stock ("CES"), and Can Tab Stock ("CTS") for their own use ("A-B Directed Volume" and "Crown Directed Volume"), and also purchased CBS, CES, and CTS as a CCBSS "Member" ("CCBSS Directed Volume").

[5] Novelis's argument that CCBSS's expert's affidavit is based on conclusory statements is unfounded (and Novelis has pointed to no ruling by the trial court excluding the expert on

Novelis argues that its MFN compliance calculations and supporting testimony demonstrate that Novelis was in compliance with conversion prices for all relevant periods. Novelis presented the affidavit of its vice president of sales and marketing for North American can stock. He stated that he measured Novelis's compliance with the MFN in 2007 and 2008. The exhibits attached to his affidavit showed that Novelis's pricing to A-B and Crown for those years was compliant with the MFN.

The parties disagree about the proper method of calculating conversion costs, and the STA is silent on this issue. The evidence presented by the parties is therefore contradictory on the question of whether Novelis offered A-B and Crown lower conversion costs or an element that makes the conversion cost per pound more advantageous as a whole. Because there remains a genuine issue of material fact concerning Novelis's breach of this portion of the MFN, the trial court erred in granting summary judgment to Novelis. See, e.g., *Board of Regents v. Doe*, 278 Ga. App. 878, 888 (3) (630 SE2d 85) (2006).[6]

3. Because we have held in Division 2 that the trial court erred in granting summary judgment to Novelis on CCBSS's claim that Novelis offered a lower conversion price to CCBSS's competitors, we must also reverse the grant of summary judgment to Novelis on CCBSS's claim for attorney fees pursuant to OCGA § 13-6-11. See, e.g., *Jamal v. Hussein*, 237 Ga. App. 779, 785 (3) (515 SE2d 407) (1999) (reversing grant of summary judgment on attorney fees in light of holding that summary judgment on main claim was improper).

### Case No. A11A0385

4. In two enumerations, Novelis claims that because the Exhibit A referred to in the STA was never attached, the STA is unenforce-

---

this ground or otherwise finding him unqualified). The expert, a certified public accountant and financial specialist accredited in business valuation, based his conclusions on his analysis of Novelis's contracts with A-B and Crown, Novelis's price lists, and Novelis's methodology. "Expert opinion testimony is allowed where the nature of the question is such that the factors leading to a conclusion are not known to the common or average person, but are among those things shrouded in the mystery of professional skill or knowledge." (Citation and punctuation omitted.) *Bailey v. Annistown Road Baptist Church*, 301 Ga. App. 677, 689-690 (12) (689 SE2d 62) (2009) (full concurrence in Division 12). And such testimony is allowed even as to the ultimate issue. *PN Express, Inc. v. Zegel*, 304 Ga. App. 672, 679 (4) (697 SE2d 226) (2010).

[6] In light of our holding here that there remains an issue of fact concerning whether Novelis offered A-B and Crown a lower conversion cost, we need not address CCBSS's related claims: that Novelis "illegitimately allows itself an exemption of $250,000 per customer per year as an 'Investment Related Discount,' " or its claim that the trial court "erroneously held that the MFN envisions annualized weighted averages." Nor do we address CCBSS's contention that Novelis impermissibly aggregates all can stock products in its MFN compliance calculation, rather than comparing prices product by product.

able and the trial court erred in granting CCBSS summary judgment on Novelis's affirmative defense based on this ground. The first paragraph of the STA provides: "This Soft Toll Agreement for Aluminum Can Stock . . . by and between Novelis . . . and [CCBSS], acting solely as agent for and on behalf of its members identified in *Exhibit A attached hereto* and made part hereof (the 'Members')." (Emphasis supplied.) The parties do not dispute that Exhibit A, listing the members or the bottlers represented by CCBSS, was not attached to the STA.

The trial court held that

> [t]he STA was negotiated over several months by very sophisticated parties who, nonetheless, executed the agreement even though it omitted Exhibit A which was intended to provide an exact list of the Coca-Cola Bottlers for whom CCBSS was acting as procurement agent. Despite that omission, it is clear from the language of the STA and three years of performance under that agreement that the parties intended to form a contract and to be bound thereby. Thus, the question remains whether there is sufficient extrinsic evidence to determine who the parties intended to include on the missing Exhibit A. It is clear from the record, including deposition testimony from Novelis's lead negotiators, that CCBSS entered into the STA on behalf of all of its North American members and that both parties knew that CCBSS was representing all of its North American members.

We agree. "A contract is unenforceable where there is no meeting of the minds between the parties regarding a material element thereof." (Citation omitted.) *Computer Assoc. Intl. v. U. S. Balloon Mfg.*, 10 AD3d 699, 700 (782 NYS2d 117) (2004). And

> [t]he doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to. That said, imperfect expression does not necessarily indicate that the parties to an agreement did not intend to form a binding contract. A strict application of the definiteness doctrine could actually defeat the underlying expectations of the contracting parties. The conclusion that a party's promise should be ignored as meaningless "is at best a last resort."

(Citations and punctuation omitted.) *Korff v. Corbett*, 18 AD3d 248,

250 (794 NYS2d 374) (2005). Moreover,

> the fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent, and the best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous.

(Citations and punctuation omitted.) *Wells Fargo Bank Northwest v. US Airways*, 30 Misc.3d 1241 (2011) (unpublished).[7]

Because the exhibit listing CCBSS's members was omitted from the contract, but can be explained or supplemented by the parties' course of dealing, the trial court did not err in considering extrinsic evidence to determine the parties' understanding of whom CCBSS was representing as its members. Id.; see NY U.C.C. Law § 2-202 (a) (2011). The New York Uniform Commercial Code provides that "[t]he express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other." NY U.C.C. Law § 2-208 (2011).

It is clear, from the deposition testimony of a Novelis negotiator, that Novelis understood that CCBSS was representing all of its North American members. The negotiator stated that he understood that the STA "was for 85 percent of the can sheet requirements of all North American Coca-Cola Bottlers." A second Novelis negotiator for the STA deposed that he understood that CCBSS acted as agent for procurement in North America, and that at no time during negotiations did the parties go "through that long list of who the members were." See *Korff*, supra.

Moreover, review of the STA itself reveals various references to North America: (1) North America is defined in the STA; (2) Paragraph 4.1 provides that "CCBSS, as agent for the Members, shall require that the Members' CMs [can manufacturers] purchase a minimum of eight-five (85%) of their collective North American requirements"; (3) the same provision provides that "[t]he members, through CCBSS as agent shall instruct the CMs to purchase Aluminum Can Stock under this Agreement for delivery to ship-to locations in North America that are mutually agreed upon"; and (4) Paragraph 14 discusses the consequences of Novelis offering to another customer "for delivery in North America" a lower conver-

---

[7] Novelis's argument here with regard to the statute of frauds is therefore without merit.

sion cost. The STA also contemplated possible changes in CCBSS's members during the contract term.

The extrinsic evidence before the trial court shows that the parties understood that CCBSS represented all of its North American members and that the specific list of those members was not necessarily material to the consummation of the STA. Although Novelis argues that the trial court ignored other contradictory evidence that would have precluded the grant of summary judgment, none of this evidence creates a *material* issue of fact as none contradicts CCBSS's assertion, Novelis' acknowledgment, and other language in the STA, that CCBSS was representing all of its North American members. See *Baker v. Baker*, 257 Ga. 187, 188-189 (356 SE2d 873) (1987) (expert affidavit did not create *material* issue of fact where undisputed evidence answered question of what parties mutually agreed upon).

Novelis's reliance on *166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp.*, 78 NY2d 88, 91-92 (575 NE2d 104) (1991), for the proposition that the trial court can only rely on an *objective* extrinsic event, is misplaced. In that case, although the contract did not explain how rent was to be calculated in a lease, the parties selected a process for making that calculation. Id. In holding that the renewal term of the lease was enforceable, the court held that where there is *an absence of an explicit contract term*, the requirement of definiteness can be satisfied by an agreement as to the methodology for determining the missing term or an objective extrinsic event, condition or standard on which the amount was made to depend. Id. at 92; see also *Chesler v. Bronstein*, 176 Misc.2d 237, 242-243 (672 NYS2d 82) (1997) (where agreement is silent as to dollar amount, court can look to see if agreement contains methodology for determining missing term or reference can be made to objective extrinsic event). The missing exhibit here was not "an explicit term" such as price requiring objective extrinsic evidence, but rather a peripheral matter not affecting the purpose of the contract here.

5. Because we have found in Division 4 that the trial court did not err in denying Novelis's claim that the STA is unenforceable, Novelis's claim for unjust enrichment is moot.

6. Novelis claims that the trial court erred in ruling that a statement concerning the metal price claim by CCBSS's president was privileged. This contention, however, is rendered moot by our holding in Division 1 that Novelis had no obligation to CCBSS with regard to CCBSS's metal price claim.

For the above reasons, we affirm in Case No. A11A0385, but reverse in part the trial court's judgment in Case No. A11A0384 because a genuine issue of material fact remains concerning whether Novelis breached the STA by offering a lower conversion cost to

another customer.

*Judgment affirmed in part and reversed in part in Case No. A11A0384. Judgment affirmed in Case No. A11A0385. Mikell and Dillard, JJ., concur.*

DECIDED JULY 7, 2011 —
RECONSIDERATION DENIED JULY 27, 2011 — ▮▮▮▮▮▮▮▮

*Troutman Sanders, James A. Lamberth, June A. Sauntry, Sidney L. Moore III, John J. Dalton*, for appellant.

*Bondurant, Mixson & Elmore, H. Lamar Mixson, Lisa R. Strauss*, for appellee.