**THIRD DIVISION
BOGGS, J.
RAY and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**March 28, 2013**

# In the Court of Appeals of Georgia

A12A2544. ZURICH AMERICAN INSURANCE COMPANY et al.
v. HEARD et al.

BOGGS, Judge.

Zurich American Insurance Company, American Zurich Insurance Company, and American Guarantee and Liability Insurance Company (collectively "insurers") appeal from the trial court's order granting summary judgment in favor of John Heard, John Heard Associates, Inc., Hairston Engineering, P. C., and Harry Hairston, Jr. (collectively "appellees"). The insurers contend that the trial court erred by concluding: (1) that contribution and indemnity under OCGA § 51-12-32 were precluded by the apportionment statute, OCGA § 51-12-33; (2) that even if contribution were still available, the insured and the appellees in this case were independent, not joint, tortfeasors, from whom contribution is not available; (3) that

the settlement was a voluntary payment; and (4) that all of the insurer's claims against the appellees should be considered reframed claims of contribution. For the reasons explained below, we agree and therefore reverse.

"On appeal from the grant or denial of summary judgment, we apply a de novo standard of review." (Citation omitted.) *Coca-Cola Bottlers' Sales &c. v. Novelis Corp.*, 311 Ga. App. 161 (715 SE2d 692) (2011). "[T]he moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. [Cit.]" *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); see also OCGA § 9-11-56 (c). So viewed, the record shows that Pinkerton & Laws of Florida, Inc. ("P&L") entered into a contract to serve as the general contractor for construction of a hotel in Brunswick, Georgia. While P&L'S contract provided for mandatory arbitration, it also included the following provision regarding joint arbitration of claims with the architect:

> No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined.

John Heard Associates ("JHA") entered into a separate contract to provide "architectural and structural, mechanical, electrical and plumbing engineering design services" for construction of the same hotel. JHA also agreed to perform "construction administration," which included monthly site visits to review the "[q]uality of construction."

Because John Heard, an architect, was not a licensed engineer, JHA entered into a subcontract with Wellborn Technical to provide the MEP (mechanical, electrical, and plumbing engineering) and HVAC (heating, ventilating, and air conditioning) design services for the hotel. Heard knew that the principal of Wellborn Technical, Billy Wellborn, was not a licensed engineer at the time of the subcontract. After obtaining Heard's contract, Wellborn entered into an oral agreement with Harry Hairston, a licensed engineer, to provide the required MEP and HVAC designs. While Heard knew that Wellborn would obtain the assistance of a licensed engineer, he testified that he did not recall any discussion with Wellborn about who should be hired.

The record shows that both during and after construction of the hotel, the owners discovered the presence of mildew and signs of moisture trapped in the building. In June 2008, the owners filed a demand for arbitration against P&L and

3

JHA seeking monetary damages in excess of $500,000. In their "overview" of their claims and damages, the owners requested that the award be made against P&L and JHA "jointly and severally" based upon P&L's negligent construction and Heard's negligent design. After P&L filed a motion to sever the claims, relying upon its right to insist upon a separate arbitration, JHA was dismissed from the arbitration proceeding. The owners then filed suit against Heard and JHA in Gwinnett County State Court,[1] and P&L unsuccessfully sought to intervene in that suit.[2]

P&L and the owners settled the arbitration claim based, in part, upon the following terms: that P&L would enter into a consent arbitration award in the amount of $6.2 million; that P&L would pay $2.3 million within 14 days after the settlement agreement was executed; that this payment would "not represent a full satisfaction of [the owner]'s damages"; that upon receipt of the payment, the owners agreed not to

---

[1] The owners alleged in this suit that they suffered damages as a result of JHA and Heard's "failure and refusal to conduct an investigation of the mildew, odor and possible water intrusion problems at the Hotel;" JHA and Heard's failure to provide sufficient information to P&L in the construction drawings; and JHA and Heard's failure to discover or notify the owners that P&L was not constructing the hotel in the manner required by the drawings.

[2] The record before us does not include the order denying the motion to intervene, but in their brief opposing intervention, the owners asserted several positions, including that P&L's claims for contribution and indemnity would not be impaired by the outcome of the owner's suit against JHA and Heard.

4

seek any recovery of the award from P&L; that "P&L's claims for contribution and/or indemnification" were preserved; and that P&L would waive and release its counterclaim against the owners in the pending arbitration. The settlement agreement also stated:

> The Parties agree that the Award shall represent the losses, costs, injuries, and damages suffered by [the owners] arising out of or relating to the Hotel and/or the Arbitration as of December 15, 2009 (the "Damages"), including repair costs, lost profits, costs of investigation and repair design, and the attorneys' fees and expenses of the Arbitration. This Award is consented to as part of the Parties' desire to compromise and resolve disputed claims and is not an admission of liability by P&L.

Six months later, the owners settled their claims against JHA and Heard for $100,000. The written settlement agreement contained the following provision:

> The Releasors [the hotel owners] understand and acknowledge that the payment being made by the Releasees [JHA and Heard] represents a full and final satisfaction of any and all claims, damages, or losses claimed by or that could be claimed by the Releasors allegedly arising from, caused by, or related to any architectural or engineering (including structural, mechanical, electrical, and plumbing) design services or construction contract administration services provided by the Releasees

5

with respect to the Project.[3] The Releasors also acknowledge that any payment previously received by the Releasors pursuant to any settlement agreement or release arising out of the claims asserted in the arbitration proceeding [against P&L] . . . did not arise from or relate in any way to any architectural or engineering services provided by the Releasees with respect to the Project.[4]

Less than one year after P&L's settlement with the owners, the insurers filed a suit against Heard, J&H, Hairston Engineering, P.C., and Jerry Hairston, Jr.[5] They asserted causes of action for professional negligence (Count 1), third party breach of contract (Count 2), negligent misrepresentation and/or omission of fact (Count 3), and contribution/indemnity based upon the appellees' joint tortfeasor status with P&L (Count 4). The facts alleged to support these claims were that insufficient information was provided to P&L in the construction drawings; that the defendants failed to

---

[3] The agreement defined "Project" as "the development, design, construction, and operation of the [hotel by the owners], including, but not limited to, any and all claims that were or could have been asserted in the lawsuit [against Heard and JHA]."

[4] The owners did *not* agree to indemnify JHA and Heard from any contribution claims asserted against them by non-parties to their settlement agreement, such as P&L.

[5] The insurers sought a subrogation recovery for the amounts paid by them on behalf of P&L and sought to recover for P&L's damages not covered by insurance through an assignment.

provide adequate construction administration; that J&H and Heard refused to conduct an investigation into the moisture problems at the hotel; and that Hairston Engineering and Jerry Hairston incorrectly designed the HVAC system in the hotel.

All of the defendants moved for summary judgment in their favor. JHA and Heard asserted that (1) the insurers' claim for contribution and indemnity fails because joint tortfeasors can no longer assert these claims following the enactment of the apportionment statute, OCGA § 51-12-33; (2) any payment for damages caused by the defendants "was a voluntary payment for which the defendants cannot be responsible;" (3) a waiver of subrogation clause barred the insurers' claims; (4) the insurers' claims for professional negligence and negligent representation are barred by the statute of limitation; and (5) the insurers' third-party beneficiary claim fails because P&L was not an intended beneficiary of the contracts between the owners and JHA. In their motion for summary judgment, Hairston Engineering and Jerry Hairston adopted the grounds asserted by their co-defendants and added one additional argument for summary judgment in their favor: the design services provided by them were complete at the permitting phase of the project and they cannot be held responsible for design changes made by Billy Wellborn during construction without their knowledge and consent.

7

The trial court granted summary judgment to the defendants for the following reasons: (1) after the Legislature's enactment of OCGA § 51-12-33, "there is no longer a right of a 'joint trespasser to contribution from another or others' that can continue, regardless of whether liability is imposed by virtue of a settlement or a verdict;" (2) even if contribution claims may still be made among settling defendants, the defendants in this case are independent tortfeasors, not joint tortfeasors, based upon the insurance policies at issue and the underlying facts surrounding the two settlements; (3) even if some portion of the payments by the insurers represented an amount resulting from the defendants' negligence, it was a voluntary payment in light of the apportionment statute and policy exclusions; and (4) the insurers' remaining claims fail because they are "nothing more than a reframed contribution claim." The insurers take issue with each of these findings in their appeal.

1. We first consider whether claims for contribution between joint tortfeasors who have settled with the plaintiff still exist following the enactment of the apportionment statute, OCGA § 51-12-33. Subsection (b) of this Code section provides:

> Where an action is brought against more than one person for injury to person or property, *the trier of fact*, in its determination of the total

amount of damages to be awarded, if any, *shall* after a reduction of damages pursuant to subsection (a) of this Code section, if any, *apportion its award of damages* among the persons who are liable according to the percentage of fault of each person. *Damages apportioned by the trier of fact* as provided in this Code section *shall be the liability of each person* against whom they are awarded*, shall not be a joint liability* among the persons liable*, and shall not be subject to any right of contribution*.

(Emphasis supplied.) Based upon the plain language of subsection (b), joint liability and the right of contribution no longer exist when damages have been apportioned by the *trier of fact* under this subsection. Based upon this plain language, it cannot be interpreted to abolish the right of contribution between settling joint tortfeasors when there has been no apportionment of damages by a trier of fact. See *Six Flags Over Georgia II, L.P. v. Kull*, 276 Ga. 210, 211 (576 SE2d 880) (2003) ("Where the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden.") When enacting subsection (b) of OCGA § 51-12-33 in 2005, the Legislature left OCGA § 51-12-32 intact in its entirety and it remains valid law. This latter Code section provides:

(a) *Except as provided in Code Section 51-12-33*, where a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them

9

jointly. *Without the necessity of being charged by action or judgment, the right of a joint trespasser to contribution from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement* of a claim or claims for injury to person or property or for wrongful death and release therefrom.

(b) If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution.

(c) Without the necessity of being charged by an action or judgment, the right of indemnity, express or implied, from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim or claims for injury to person or property or for wrongful death and release therefrom.

(Emphasis supplied.) Based upon the plain language of this statute, the right of contribution between joint tortfeasors has not been completely abolished by the Legislature's enactment of OCGA § 51-12-33 (b), and the trial court erred by holding otherwise.[6]

---

[6] The Supreme Court's opinion in *McReynolds v. Kreb*, 290 Ga. 850 (725 SE2d 584) (2012), does not require a different result. In that case, the trier of fact determined the amount of damages owed by one defendant, and the appellant conceded that she had no evidence of liability which would support apportionment against another defendant that settled before trial. Id. at 852-853 (1) (b).

2. We must now consider whether the trial court properly concluded that P&L and the appellees were not joint tortfeasors as a matter of law.[7] The test for determining joint tortfeasors is whether "the separate and independent acts of negligence of two or more persons or corporations combine naturally and directly to produce a single indivisible injury. . . ." (Citation, punctuation and emphasis omitted.) *Zimmerman's, Inc. v. McDonough Constr. Co.*, 240 Ga. 317, 320 (1) (240 SE2d 864) (1977). Statements made in settlement agreements between the parties and the separate legal proceedings (the Gwinnett lawsuit and arbitration) do not support the trial court's conclusion that no joint liability existed. The issue is whether a single indivisible injury resulted from the negligence of P&L and the appellants, *not* how the different entities involved conducted legal proceedings or described payments made in settlement. "Where no judgment finding both tortfeasors liable has been entered, a right of contribution still exists, but the party seeking contribution must prove that his own negligent actions and those of the alleged joint tortfeasor jointly caused the harm." (Citation, punctuation and footnote omitted.) *Suggs v. Hale*, 278

---

[7] Although appellees assert that the trial court made "no such holding," and therefore make no argument against a finding that they were joint tortfeasors with P&L, the trial court's order plainly states, "Even if contribution claims still existed among settling defendants, the facts of this case do not support the Plaintiffs' claims. Contribution only applies to joint tortfeasors – not independent tortfeasors."

11

Ga. App. 358, 360-361 (2) (629 SE2d 11) (2006). "As a general rule, the substantial rights of the parties in a negligence case, including the right to contribution between joint tortfeasors, become fixed at the time of injury or the event upon which liability depends. [Cits.]" *Byington v. Lee*, 150 Ga. App. 393, 394 (1) (258 SE2d 6) (1979). The trial court therefore erred by concluding as a matter of law that P&L and the appellants were *not* joint tortfeasors. See *Big Canoe Corp. v. Moore & Groover, Inc.*, 171 Ga. App. 654, 657-658 (2) (320 SE2d 564) (1984).

3. The insurers contend the trial court erred in finding that their contribution and indemnity claims were barred because the settlement was a voluntary payment. We agree.

(a) The trial court concluded that the entire settlement payment was a voluntary payment "because, in light of apportionment, P&L had no legal obligation to pay and could not be held liable for any damages resulting from the negligence of the [appellants]." This conclusion was erroneous for the reasons stated in Division 1 of this opinion.

(b) The trial court also found that the insurers' settlement should be construed as a voluntary payment because of the professional services exclusions in the insurance policies. The court found it significant that the insurers admitted in their

12

discovery responses "that they never paid money under either the CGL policy or the Umbrella Policy for any damages that would have been excluded from coverage." The trial court reasoned that because the policies excluded coverage for professional services, the settlement payment cannot be construed as a payment caused by appellants' alleged professional negligence. The trial court's reasoning is flawed, however, because the record shows that the insurance policies excluded coverage for professional services rendered by or on behalf of P&L, not other parties, such as the appellants. Additionally, in an OCGA § 9-11-30 (b) (6) deposition, the insurers' representative testified that the insurers paid for damages caused by P&L's construction work relying on the appellees' designs. Additional testimony that the insurers were not obligated to pay damages for the acts or omissions of the appellees generally or for professional services, does not the alter evidence showing that the insurers paid for damages caused by the combination of P&L's conduct during construction and the designs provided by appellees - - a single indivisible injury covered by the policy.

(c) The trial court's finding that the insurers made a voluntary payment based upon a mold exclusion in the policy was also erroneous. The record shows that the insurers did *not* pay for mold damage because it was excluded under the policy.

13

Instead, they paid for property damage claims resulting from structural issues and water intrusion, as well as loss of use resulting from covered property damage. It is undisputed that the insurers contributed $1,463,950.00 to the settlement and that P&L paid $721,050.00 for uninsured damages, including those caused by mold and the use of EIFS (exterior insulation and finish system). P&L subsequently assigned its interest in uninsured damages to the insurers. Based upon this record evidence, the trial court erred by concluding as a matter of law that the insurers made a voluntary payment for mold and mildew damages not covered by the policies.

Because the record fails to establish, as a matter of law, that the insurers' subrogation and assigned claims for contribution and indemnity are barred by voluntary payment, the trial court erred by granting summary judgment in favor of the appellees on this ground.

4. In their remaining claim of error, the insurers contend that the trial court erred by concluding that they could not recover on their remaining theories of recovery because they were "nothing more than a reframed contribution claim." Based upon our holdings in Divisions 1-3 regarding contribution, this enumeration of error is rendered moot.

5. In their briefs, appellees request this court to rule on additional grounds for summary judgment raised below, but not ruled upon by the trial court. In accordance with *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002), we decline to address the additional grounds not ruled upon by the trial court. We are reversing the trial court based upon its application of an erroneous legal theory, and the additional grounds involve potential undisputed issues of material fact and legal theories not adequately briefed by the parties before this court.

*Judgment reversed. Ray and Branch, JJ., concur.*